[Crim. No. 3969.   Third Dist.   Apr. 4, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. ROBERT EDWIN CULP, Defendant and Appellant.

J. E. Kleaver, Public Defender, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, and Nelson P. Kempsky, Deputy Attorney General, for Plaintiff and Respondent.

GOOD, J. pro tem.*—Defendant appeals from a judgment entered after a jury convicted him of a charge of voluntary manslaughter. The case was tried shortly before the decision in *Griffin* v. *California,* 380 U.S. 609 [85 S.Ct. 1229, 14 L.Ed.2d 106], proscribed any reference to a defendant's failure to testify in a criminal case. The district attorney argued the adverse inferences that pre-*Griffin* could be drawn from a defendant's failure to testify and the court gave the standard instruction, CALJIC 51 Revised, which contained a comprehensive statement of the theretofore accepted California law on the subject. A fairly detailed statement of facts is necessary herein because one of the main questions presented is whether upon the evidence properly admitted at the trial a result more favorable to the defendant could be reasonably expected if a retrial was had with the error eliminated. The facts are as follows:

In midafternoon of February 28, 1965, James Lynne Crone was found dead in a cabin outside of Tulelake, California. He had been living at the cabin with defendant Culp and Delbert Pruett, a codefendant who was convicted of involuntary manslaughter. Death had occurred between 6 and 9 o'clock that morning. His body, found in bed, showed various contusions and abrasions. His eyes were blackened and he had been bleeding from the mouth. The autopsy showed that serious but not fatal injuries had been received two or more days before death. Some of these earlier injuries were severe enough to have caused minor brain hemorrhages but within 12 to 24 hours before death Crone had sustained injuries that resulted in a massive subdural hemorrhage (the cause of death), other smaller brain hemorrhages, four broken ribs and a fractured sternum. In the pathologist's opinion, although most of the injuries could have been caused by repeated falls, they were all compatible with a beating and it was very unlikely that the fractured sternum could have resulted from a fall or other accidental means.

About 10 o'clock that morning, Culp and Pruett were seen to leave the cabin and come to a nearby packing shed where they asked a construction worker for a ride to Klamath Falls. They were refused and returned to their cabin. After a short time they emerged, each carrying a duffle bag or other bundle. After a negative response to another request for a lift to Klamath Falls they started walking the tracks to Tulelake.

*Assigned by the Chairman of the Judicial Council.

Between 2:30 and 2:40 that afternoon they were seen at the Greyhound Bus Depot, where they purchased tickets to Klamath Falls. When the bus arrived, Pruett was so drunk he was not allowed aboard the bus.

Around 4 p.m. a constable saw Pruett at a bar in Tulelake. Pruett told the constable there was a "stiff" at the old Brock place and asked the constable why he didn't go get him. The constable assumed Pruett was referring to a drunken man and did nothing. Meanwhile, about 3 p.m. a farm laborer went to the cabin to borrow a tool. The door opened when he knocked and he saw Crone's body. He called another person and they phoned the authorities. Pruett was taken into custody about 5 p.m. Later that night Culp was apprehended in Klamath Falls, Oregon, and was interrogated there by a Siskiyou County deputy sheriff about 11 p.m. Culp was then "under the influence" but in the deputy's opinion was coherent and in possession of his faculties. He was adequately advised of his rights to counsel and to remain silent. He denied knowing anyone named Crone, said he had not been at the cabin for almost a week but had been in Alturas and had hitch-hiked to Tulelake that day and there boarded the bus to Klamath Falls. There were further interrogations on March 1st and 2d while Culp was in custody at Yreka. The deputy described Culp as then being more "sober" but showing signs of an onset of delirium tremens. The deputy believed Culp's mental processes were not affected by his physical condition. On March 1st, the "shakes" were alleviated by a cup of coffee. Culp was again advised of his rights. During this interrogation, he admitted that his denials and attempted alibi were false, admitted being at the cabin on the night of the 27th and described Crone as being drunk and falling down numerous times over chairs and the stove in the cabin. He also said the deceased had been hurt three or four days before when he fell with a milk can while unloading a truck. Culp also described the incident at the bus station when Pruett was refused transportation.

On March 2d the deputy again informed Culp of his rights and recounted the substance of Pruett's statements to the effect that Culp had struck Crone a number of times and had put him out of the cabin. Culp admitted that he struck Crone two or three times that night. During this interrogation Culp was complaining of chills, shakes, cramps and of needing paraldehyde. Either early or in the middle of this interrogation (the deputy gives two time estimates) it became apparent

that Culp did require medical attention. A doctor was summoned and he was taken to the county hospital where he was under treatment for a week or so.

Pruett's statements were secured at interrogations held separately during the same three days and without Culp being present. On each occasion he was informed of his right to counsel and to remain silent. In substance, during his second and third interrogations, Pruett said that on the evening of the 27th Culp had thrown Crone out of the cabin when the latter refused to go out and gather firewood; that Culp would evict Crone whenever he attempted to reenter and had struck Crone three or four times in the process; and that when Crone had not returned for some time Culp and Pruett went outside, found Crone unconscious and carried him into the cabin and laid him on the bed. He said Culp found Crone dead in the morning and suggested that they go to Klamath Falls.

A farmer who had been at the cabin on February 24 testified that he had seen Crone at that time and Crone then appeared to be badly beaten up. He employed Culp for a temporary job that day. In response to questions about Crone's appearance, Culp first stated that Crone "got beat up down town" but later stated that he, Culp had "beat him up" because Crone "just talks too much . . . so I shut him up."

The codefendants were represented by separate counsel. All of the interrogations of the defendants were taped but only Culp's tape was received in evidence. At that time the jury was instructed that the statements of one codefendant made outside of the other's presence would be hearsay and not binding upon nor to be considered as evidence against the other. The Pruett tapes were not received in evidence but the interrogating deputy was permitted to refer to typed transcriptions thereof to refresh his memory. His testimony of their substance including the portions inculpating Culp was admitted under a twice repeated admonition that Pruett's statements could not be considered evidence against Culp. Neither defendant testified at the trial.

The minutes reflect that after several hours of deliberation the jury returned to the courtroom to request a reading of the deputy's testimony and to replay the tape of Culp's interrogations. This was done. The foreman then asked if the jury could hear "certain testimony as to when the defendant Culp asked the deceased . . . to get wood." The court informed the jury that this was not brought out as testimony but as part of an unsworn statement made by defendant Pruett

which was not binding upon Culp nor in evidence against him. After further deliberation, the jury found Culp guilty of voluntary manslaughter and Pruett of involuntary manslaughter.

At the hearing of Culp's motion for new trial the learned trial judge adverted to *Griffin* v. *California, supra.* The misconduct proscribed therein had occurred. The judge expressed concern about the possible use of the Pruett statements in reaching the adverse decision against Culp. However, he denied the motion because it appeared to him that the jury would have reached the same verdict in any event. He also stated that the reference to the statements given by the codefendant was "prejudicial" but "that the reasonable probability is that they did not affect the outcome of the trial."

At the time of trial and until *People* v. *Aranda,* 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265] (Nov. 1965), it had been well settled that in joint criminal trials the extrajudicial statements of a codefendant, if admissible against the declarer, were properly received if the jury was clearly admonished that they were in evidence only against the declarant and could not be used against other defendants. (Cf. *People* v. *Ketchel,* 59 Cal.2d 503, 533-534 [30 Cal.Rptr. 538, 381 P.2d 394].) In *Aranda* the declarant's statement was found to be violative of the *Escobedo* (*Escobedo* v. *Illinois,* 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977]) and *Dorado* (62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]) rules and consequently inadmissible even against the declarant. It was there held that the erroneous admission of the incompetent statement of a codefendant was not cured by the standard admonition but that the prejudicial effect of the error was subject to the test of article VI, section 4½, of the California Constitution (63 Cal.2d at pp. 526-527). The court there found that reversal was required because of direct conflicts in the evidence but, considering the possibility that upon retrial the prosecution might be able to show that the statements were not violative of the *Escobedo* and *Dorado* rules, solved questions of due process by the promulgation of new rules of practice implementing Penal Code section 1098, applicable prospectively to all joint criminal trials.

Defendant's contention that the extrajudicial statements of his codefendant, Pruett, were improperly received cannot be sustained. Neither defendant's statement was secured in violation of the *Escobedo* and *Dorado* rules. The record shows that both accuseds were adequately informed of

their constitutional rights to counsel and to remain silent. The Pruett statements were relevant and material to the charges against him. He was charged with voluntary manslaughter which, by definition, necessarily includes involuntary manslaughter: the unlawful killing of a human being without malice resulting from the commission of a lawful act which might produce death, in an unlawful manner, or without due caution or circumspection (Pen. Code, § 192, subd. 2). His statements of what he did and did not do in the circumstances confronting him, Culp and the victim on the night in question were obviously relevant to the issue of failure to use due caution or circumspection. The objection that they were rendered incompetent because of his intoxication has no merit addressed either to the issue of whether he understood his constitutional rights or whether he knew what he was saying. The officer's testimony that Pruett, although intoxicated on the occasion of the first interrogation, was rational and in possession of his faculties at each interrogation was not contradicted. The objection appears to go to weight or fact rather than to the law and cannot be sustained on the present record.

■ The Pruett statements, being admissible against him, were received in accordance with then prevailing approved practices and the jury was properly admonished that they were not to be considered in evidence against Culp nor used in determining his guilt. The effect of *People* v. *Aranda, supra,* upon pending appeals from joint trials does not require automatic reversal. (*People* v. *Williams,* 239 Cal.App.2d 42 [48 Cal.Rptr. 421].) Where a codefendant's statement contains matter incriminating a nondeclarant codefendant, we are required to determine whether or not the record contains a showing of misconduct on the part of the jury sufficient to rebut the presumption that the jury obeyed the admonition and did not use the incriminating matter therein contained against a nondeclarant codefendant. The presumption is not abrogated by that decision, although stringent criticism thereof is discussed therein at some length. In presenting its solution to the problem by promulgating new court rules as above noted, the court directs (63 Cal.2d at p. 530): "In the absence, however, of a holding by the United States Supreme Court that the due process clause requires such change, the rules we now adopt are to be regarded, not as constitutionally compelled, but as judicially declared rules of practice to implement section 1098 [Pen. Code]."

The rule that a jury is presumed to obey the admonition in question has been variously stated to obtain ''in the absence of a strong showing to the contrary'' (*People* v. *Pike,* 58 Cal.2d 70, 85 [22 Cal.Rptr. 664, 372 P.2d 656]) or ''of some positive act of misconduct'' (*People* v. *Aranda, supra,* 63 Cal.2d at p. 524). It is to be conceded that where in a joint trial independent evidence against a nondeclarant codefendant is lacking (cf. *People* v. *Zammora,* 66 Cal.App.2d 166 [152 P.2d 180]) or is inconsistent, contradictory or otherwise unsatisfactory (cf. *People* v. *Aranda, supra*) so that it appears that reasonable doubt could not have been removed without conscious or unconscious resort to such extrajudicial statements of a codefendant the verdict itself may rebut the presumption. It is in cases that reflect this state of the record wherein the presumption has been characterized as a ''fiction,'' a ''mental gymnastic'' or a ''naive assumption.'' In the case at hand the independent evidence of guilt is abundant and is neither inconsistent nor contradictory.

Although it may be argued that the jury's request during deliberations for a rehearing of Culp's statements followed by a further request for that portion of Pruett's statement that inculpated his codefendant might reflect that the jury may have merged the evidence and disregarded the admonition, the present record furnishes a reasonable and compelling inference that is precisely to the contrary. The evidence herein was presented to the jury within less than five hours of court sessions. The record is remarkably free of inconsistency or contradiction. The jury's request was made after over two hours of deliberation. If the jury had in fact disregarded the admonition and used the content of Pruett's statement against Culp, there is no readily apparent reason for the request to rehear Culp's own statement or for any extended deliberation. On the contrary, the request supports the inference that one or more of the jurors, heeding the admonition, were reluctant to find Culp guilty unless his own statements furnished clear and unambiguous evidence that he had in fact struck the victim on the night in question. To assume that the additional request for Pruett's narration demonstrates misconduct is to overlook the fact that the jury had before it the difficult and vexing question of Pruett's involvement as an innocent bystander or a participant guilty only by reason of lack of ''due circumspection''—a question that is not before us. Again, it is reasonable to assume that the foreman believed that after rehearing Culp's admissions the particular sequence of Pruett's statement might have been desired by one or more jurors

in order to exonerate Pruett rather than to convict Culp or to at least reduce the former's culpability to involuntary manslaughter, as was finally done. We are of the opinion that where a reasonable interpretation of a jury's action or statements by way of requests for further assistance of the court during deliberations is compatible with the presumption that a jury has obeyed the admonitions of the court and has performed its duties with fidelity to its oath, that interpretation is to be adopted in the absence of compelling reason to the contrary. Such reason is not reflected in the present record and there is no showing that the jury was guilty of misconduct.

We turn now to a consideration of the effect of the court's instruction and the prosecution's arguments that were in violation of the rule later announced in *Griffin* v. *California, supra.* It is well settled that the provisions of article VI, section 4½, of the California Constitution apply and that a reversal is required only when it is reasonably probable that a result more favorable to the defendant would have been reached in the absence of the error. (*People* v. *Roberts,* 63 Cal.2d 84, 93 [45 Cal.Rptr. 155, 403 P.2d 411]; *People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].) In view of the impact of *People* v. *Aranda, supra,* upon trials of jointly charged defendants in criminal cases, the reasonable probabilities must be determined from the evidence that exists independently of any information contained in the Pruett statements. Viewed in this light, it is our opinion that the independent evidence of Culp's guilt of voluntary manslaughter is so overwhelming that it is not reasonably probable that a result more favorable to him would have been reached if the anti-*Griffin* error had not occurred and if the inculpating matter in the Pruett statements had not been before the jury.

The independent evidence validly admitted against Culp establishes nine uncontradicted circumstances. The combination of any four or five of them adequately sustains the jury's verdict. They are as follows: (a) Culp was present at the scene. (b) He had previously admitted that he had administered a severe and unmotivated beating to the victim three days before the night in question, the residual effects were still present and identified upon autopsy. (c) The injuries received contemporaneously with the subdural hemorrhage that was the prime cause of death were all medically compatible with a beating and it was medically unlikely that one of them (a fractured sternum) could have been caused by falls or other

accidental means. (d) These injuries were all sustained within 12 to 24 hours of the victim's death, which occurred between 6 to 9 a.m. (e) The nature of the internal and external injuries sustained the night before, as described by the autopsy surgeon and depicted externally in the photographs of the victim's body when discovered, indicate that the severely incapacitated victim had been deposited upon his bed the night before with no attempt to secure medical or other aid. (f) Between one and four hours after death occurred, the two defendants abandoned the cabin, took their belongings and departed without reporting the death to anyone. (g) Upon Culp's apprehension that night at Klamath Falls, Oregon, he denied all acquaintanceship with the victim and offered an involved alibi to account for his whereabouts elsewhere during the time interval wherein he had twice beaten the victim. (h) The next day he admitted that his denial of acquaintance with the victim and his alibi were both false and said that the victim had been drunk and kept falling down and hurt himself and that he, the victim, had also hurt himself three or four days before when a milk can fell from a truck where he had been working. (i) Culp finally admitted that he had struck the victim two or three times during the time interval when the fatal injuries were sustained.

The evidence supporting these circumstances is not ambiguous or contradictory and does not depend in any material degree upon the sparse detail of timing and pitiable motivation furnished by Pruett's statements. The timing of the blows delivered that night is of negligible consequence in view of the end result. Nor is this a case wherein motivation, proof of which is never essential (cf. 1 Witkin, Cal. Crimes (1963) p. 59), is of assistance in removing doubt or completing proof. The same gratuitous, if drunken, brutality and lack of understandable human motivation inheres in Culp's independent account of the beating three days before the fatal night. Quite aside from defendant's election not to testify, the defense failed to produce any substantial or credible evidence to contradict or raise any doubt affecting the circumstances we have recounted above. The explanation that the victim injured himself by becoming "falling down" drunk is met by the defendant's ultimate admission of striking the victim two or three times on the night in question as well as by the medical testimony of the unlikelihood of such causation. The theory that the victim sustained the injuries because a milk can fell upon him is incompatible with both defendant's account of the earlier beating on February 24 and the autopsy findings.

Upon these circumstances of opportunity, pattern, flight, false alibi, evasive and false explanations and, finally, defendant's own admissions, there could have been no lingering doubt of defendant's guilt that was subject to removal by resort to any adverse inferences arising out of defendant's failure to testify or to Pruett's statements which, per *Aranda, supra,* would be eliminated if the case were retried. Defendant's election not to testify did not destroy the presumption that witnesses speak the truth. It does not add to or detract from the strength of the evidence that establishes the incriminating circumstances detailed above. The impact of defendant's own admissions of February 24 and March 2 coincident with any combination of the independently established circumstances negate the possibility that the anti-*Griffin* error even in combination with an assumed anti-*Aranda* error had a consequential effect upon the jury's verdict or that a result more favorable to the defendant was reasonably probable absent such error. For these reasons, there was no miscarriage of justice within the meaning of article VI, section 4½, of the California Constitution.

The judgment of conviction is affirmed.

Pierce, P. J., and Friedman, J., concurred.