[Crim. No. 13614.   Second Dist., Div. Four.   May 20, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. ELLIS BAYLES MYERS, JR., Defendant and Appellant.

Ferdinand F. Fernandez, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Daniel J. Kremer and Richard L. Hamilton, Deputy Attorneys General, for Plaintiff and Respondent.

KINGSLEY, J.—Defendant was charged with violating Penal Code section 217, assault with intent to commit murder. A deputy public defender was appointed, defendant was arraigned, defendant pled not guilty, a jury trial was held, and defendant was found guilty as charged. Motion for new trial was denied, probation was denied, and defendant was sentenced to state prison for the term prescribed by law. Defendant has appealed from the judgment and from the order denying a new trial. The latter order is not appealable and we dismiss that portion of the appeal.

Carlos Hyder was employed as a bartender at Jack's 1117 Club on November 29, 1966. Janet Nord, the owner's wife, and McKinley Holmes were also at the club on November 29th. At 1 or 1:30 a.m., they saw defendant, and Hyder asked what defendant was going to drink. Defendant said he wasn't drinking. Hyder tended to other customers, defendant walked around, Hyder repeated his question to defendant and defendant refused to order. Defendant walked over to a pool table and "pestered" some of the players. Defendant leaned on a pool table, stared at a player, walked up to people and just looked at them. Defendant walked about slowly, staggered, weaved and swayed at times and acted as though he was under the influence of alcohol or drugs, or both. Mrs. Nord, who was suspicious of defendant, warned her husband. Defendant ordered a five cent bag of peanuts, and started to pay Hyder for them out of change that was left on top of the bar by one of the customers who was playing pool. Hyder told defendant he would have to pay for the peanuts himself, and defendant reached into his pocket and took out a nickel and gave it to Hyder.

At 1:45 a.m. Hyder announced to the patrons that closing time was approaching and it was the last opportunity to order drinks. At 2 a.m. defendant ordered a beer and Hyder said he wasn't serving anymore. Holmes asked Hyder if defendant was causing trouble. Hyder said no. Holmes approached defendant, who started for the door. Hyder went to the side door to allow the patrons to exit, Hyder returned, and defendant pulled out a gun and pointed it at Hyder. Holmes shouted, "don't pull the gun." Hyder moved to the rear office to get a gun and defendant fired a shot. Hyder felt wood splinters hitting his neck. Hyder, now in the office, heard two more shots. Hyder fired at defendant and defendant fired and hit Hyder's cheek, inflicting a wound which did not require medical attention. Defendant fired another bullet, making a total of six. One bullet was traveling at Hyder but was

stopped by a metallic electrical box. Defendant clicked his gun, Holmes and others chased defendant and defendant threw his gun into the weeds. Officer Carter, a traffic officer, arrived.

On November 29, 1966, at about 2:40 p.m. Officer Gustasun, a Los Angeles County Deputy Sheriff, had a conversation with defendant. Before defendant made any statement Officer Gustasun read a statement to him advising him of his constitutional rights. Defendant was told he was entitled to an attorney at all stages of the proceedings, including the interrogation; that if he couldn't afford an attorney the court would appoint him either a public defender or private counsel at no cost to him; that anything he said would be used against him in court; that he need not answer any questions and that he may in fact refuse to answer at any time. There was also a statement included that the officer had read this to defendant; that he (defendant), had read it, understood it, and waived his rights to counsel. Officer Gustasun said that he asked defendant if he understood his rights and defendant said that he did. Defendant said, "Now can I have my gun back?" Defendant signed the rights statement after the officer made him read a portion of it back to him.

Defendant said that he and the bartender had an argument over buying peanuts and a drink, the bartender refused to serve him and refused to let him leave, he heard a voice say, "Don't get that gun, man," and he saw the bartender run for the office door, and defendant then pulled his gun and fired and defendant said he shot in a slow and deliberate manner. Defendant also said that if he hadn't wasted the last three shots that he wouldn't be in the trouble he was in because, "The dude would be dead." Defendant said that he ran from the bar when he was out of ammunition; he was captured by several patrons; he had been drinking champale and he had been given pills by a nurse to soothe his nerves.

Defendant testified that on November 28, 1966, he was not feeling well, his employer's nurse gave him a total of four pills on two occasions that day, and at 4:30 p.m. he left work. At 6:30 or 7 p.m. he went to the William Nickerson Project, and stayed until midnight. While there he had a couple of beers, a quarter of a fifth of wine, and at 11 p.m. two benzedrine stimulants. Defendant took "chewnalls" and "reds" (prohibited barbiturate drugs) while he was in Jack's. He went home and returned to Jack's at 1:30 a.m. Defendant claimed that after the peanut incident he attempted to leave,

Holmes approached him and told him not to go for his knife, defendant said he wasn't going to get a knife, and the bartender threatened "to fix" defendant for not having left. The bartender ran to the office where defendant knew a gun was kept. Defendant drew his gun as he saw the bartender arming and defendant shot him. Defendant had no difficulty recalling the details of the incident and remembered how it happened.

Defendant alleges his statements to the officer were improperly admitted into evidence and that he was prejudiced by the weekend separation of the jury.

I

Defendant does not assert that the warning given to him was defective under *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], but that he did not voluntarily, knowingly and intelligently waive the constitutional rights reflected in the warning. Defendant's counsel points out in his carefully researched brief that the drugs defendant had taken prior to receiving the *Miranda* warnings affect thinking and comprehension and the compound effects of alcohol and barbiturates last much longer in time than that of either used alone.

In *State* v. *Lowry* (1967) 245 Ore. 565 [423 P.2d 172], the Oregon court held that defendant was capable of intelligently and knowingly waiving his rights in spite of his claim he was intoxicated, but in that case there was ample evidence to support the trial court's finding that that defendant could intelligently act upon the deputies' advice. Further, other statements made to the police officers at the time Lowry's blood count was .30 were found to be made while defendant Lowry was intoxicated and those statements were excluded by the trial court. (See, also, *In re Cameron* (1968) 68 Cal.2d 487 [67 Cal.Rptr. 529, 439 P.2d 633]; and *People* v. *Culp* (1966) 241 Cal.App.2d 352 [50 Cal.Rptr. 471]—both of which we discuss below.)

However, defendant's trial counsel did not raise, at the trial, either the issue now urged on us by appellate counsel, or any contention that the statement was involuntary. The evidence as to defendant's intoxication came into the case only in support of his trial defenses—namely that he reasonably thought that he was acting in self-defense and that he was incapable, by reason of diminished capacity, to form the specific intent charged against him.

It is the general rule that, if there is no objection at

the trial to the admission of a confession, or of statements obtained in violation of *Dorado* or *Miranda*, the admissibility cannot be raised for the first time on appeal. (*People* v. *Warrick* (1967) 249 Cal.App.2d 1 [57 Cal.Rptr. 121]; *People* v. *Sanchez* (1965) 239 Cal.App.2d 51 [48 Cal.Rptr. 424].) In the recent case of *In re Cameron* (1968) 68 Cal.2d 487, 503 [67 Cal.Rptr. 529, 439 P.2d 633], our Supreme Court held that, where it appears as a matter of law from the record at the trial that a confession was involuntary, a defendant is not precluded from raising the issue on appeal even though he did not object in the trial court. But in that case, the record showed that defendant, at the time of his interrogation, was still under the influence of a massive dosage of a drug (Thorazine) which has the special effect of tranquilizing a person so that he is unappreciative of possible dangers and is easily subjected to suggestion. In the case at bench, we have no trial record that shows either that the liquor and drugs, taken between 12 and 24 hours before the interrogation, were still operative, or that the combination herein involved had the special effect which rendered Cameron's confessions involuntary. We cannot say, on the record before us, that either defendant's waiver of his *Miranda* rights, or his admissions, were involuntary *as a matter of law*. Under these circumstances, the general rule, and not the rule in *Cameron* applies. Had the matter been raised at the trial, the People and the defendant would have had the opportunity to explore both the effect and the duration of the drugs and alcohol ingested by Myers.[1]

Appellate counsel argues that the omission of an objection at the trial is excused under the doctrine of *People* v. *Kitchens* (1956) 46 Cal.2d 260, 263 [294 P.2d 17] (see, also, *People* v. *Hillery* (1965) 62 Cal.2d 692 [44 Cal.Rptr. 30, 401 P.2d 382]). That rule excuses an omission to object at the trial where the law, as understood at the time of trial, would have made an objection futile. Counsel argues that the decision in *People* v. *Culp, supra,* (1966) 241 Cal.App.2d 352, decided ten months prior to the trial, falls within that doctrine. We do not agree.

There is nothing in the *Culp* case that suggests that it would have been futile to raise the issue of whether or not the defendant is too intoxicated to waive his rights. *Culp* merely

---

[1]It should be noted that, because Cameron had objected to the introduction of other confessions, his trial record contained substantial evidence of his mental condition.

holds that, since that particular defendant was rational and in possession of his faculties, and since there was no evidence to contradict that fact, that particular defendant was capable of waiving his rights. The *Culp* case in no way implies that a different intoxicated person, in another case, who was irrational and not in possession of his faculties, would also be held capable of waiving his rights under *Miranda*.[2]

## II

Defendant claims that he was prejudiced by the weekend separation of the jury on the ground that it is impossible for a juror to refrain from thinking about the case and reaching a conclusion during the recess. As defendant admits, permitting the jury to separate after argument is a matter within the discretion of the trial court and defendant has the burden of establishing prejudice. (Pen. Code, § 1121; *People* v. *Burwell* (1955) 44 Cal.2d 16 [279 P.2d 744]; *People* v. *Moore* (1962) 209 Cal.App.2d 345, 352-353 [26 Cal.Rptr. 36].) Defendant has not sustained his burden.

The judgment is affirmed; the attempted appeal from the order denying a new trial is dismissed.

Files, P. J., and Jefferson, J., concurred.

---

[2]For this reason we also disagree with defendant's contention that the *Culp* decision is erroneous. *Culp* does not hold that an intoxicated person is always capable of waiving his rights; *Culp* merely holds that that particular defendant was not irrational and therefore was capable of waiving his rights.