[Crim. No. 8939. First Dist., Div. One. Feb. 16, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
MARSHALL L. PETERS, Defendant and Appellant.

524

## COUNSEL

Daniel E. Gibson, under appointment by the Court of Appeal, and Marjory F. Gibson for Defendant and Appellant.

Evelle J. Younger, Attorney General, Robert R. Granucci, Gary Garfinkle and Edward P. O'Brien, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MOLINARI, P. J.**—Defendant appeals from the judgment of conviction for conspiracy (Pen. Code, § 182) to violate Penal Code sections 459 (burglary) and 487 (grand theft), 'and from the order denying a new trial.[1]

Defendant contends: (1) that the court erred in overruling his counsel's objections to the introduction of illegally obtained statements; (2) that his counsel and codefendants' counsel were improperly restricted from inquiring into the homosexual relationships and activities of two accomplices who had pleaded guilty and testified for the prosecution; (3) that the court erred in admitting evidence relating to the use of narcotics; and (4) that testimony concerning shortages at all of Macy's northern California stores should not have been admitted into evidence.

We have concluded that none of these contentions has merit and that the sole possible claim of error, consisting of the admission into evidence of testimony that defendant was in possession of a hypodermic needle and a syringe at the time of his arrest would, in any event, constitute harmless error. Accordingly, we must affirm the judgment.

### The Facts

Willis Stewart, a Burns Detective Agency guard assigned to night duty at Macy's Department Store on O'Farrell Street in San Francisco (here-

---

[1]An order denying a new trial is not an appealable order, but it may be reviewed upon an appeal from a final judgment. (Pen. Code, § 1237, subd. 1.)

inafter Macy's), testified as a prosecution witness that through his cooperation defendant and codefendants Donald Eagleton and Ernest Braidlow pilfered merchandise from the store on several occasions.[2] Braidlow[3] testified that defendant told him of his connection with Stewart and that on one occasion he went with defendant and a man named Ron to Macy's in the early morning hours where he helped remove merchandise from the store into a car.

San Francisco Police Officer John Sully testified that he went to defendant's apartment in the early evening of September 21, 1969. Defendant and Eagleton were in the apartment. Upon entering the apartment he observed a large supply of clothes, television sets, tape recorders and similar items stacked in the room. Many of these items were marked with Macy's labels. Defendant stated to Sully that he had received an inheritance and used the money to buy merchandise from Macy's. Defendant and Eagleton were placed under arrest and the merchandise was taken into police custody.

Employees at Macy's testified that from July to September 1969, defendant returned substantial amounts of Macy's merchandise and sought cash refunds. Three pawn brokers testified that defendant pawned merchandise shown to have originated at Macy's.

Police Inspector Osuna testified concerning three interviews with defendant, the nature of which, and the circumstances under which they were taken, will be hereinafter discussed.

Defendant testified that he merely took food to Stewart while the latter was on duty at Macy's; that both Stewart and Eagleton were like sons to him and that Stewart became jealous of Eagleton; that the merchandise found in his apartment was being stored for Stewart; and that he sought refunds from Macy's because a heart condition had forced him to lose weight and he needed smaller sizes. He denied participation in or discussion of taking any property from Macy's.

Other pertinent facts will be hereinafter discussed in connection with the particular contentions made by defendant.

### The Statements

The record discloses that counsel for defendant indicated to the court that he was concerned with the question whether Osuna had admonished

---

[2]Stewart was charged with grand larceny and pleaded guilty to a misdemeanor.

[3]Braidlow was originally named as a defendant in the instant action but pleaded guilty before trial.

defendant as to his constitutional rights prior to his interviews with defendant. Accordingly, defense counsel requested a *voir dire* of Osuna on this issue. At the inception of the *voir dire*[4] defendant's counsel specifically indicated that the issue was "limited as to his admonition."

On *voir dire* Osuna testified that on September 22, 1969, the day after defendant was arrested, Osuna and Inspector Pedrini interviewed him at the county jail. Osuna testified that he read a card detailing defendant's rights. The printed material stated that defendant had a right to remain silent; that anything he said could and would be used against him in a court of law; that he had a right to talk to a lawyer and to have him present while he was being questioned; and that if he couldn't afford a lawyer one would be appointed to represent him before any questioning, if he wished one.[5] Defendant stated that he understood his rights but refused to sign a card indicating that he waived such rights. According to Osuna, he asked defendant if he was willing to answer questions in the light of the warnings that had been given. Defendant indicated that he was willing to answer questions.

Osuna testified further on *voir dire* that on September 23, at 6 p.m., he went to the jail for the purpose of interviewing Stewart. He observed defendant standing near some telephones in a hallway. They exchanged greetings and defendant started to talk to him. Osuna asked defendant if he wanted to talk to him. Defendant stated that he did. Osuna then advised defendant of his constitutional rights, and defendant stated that he understood them. Osuna did not recall whether he asked defendant to sign the waiver card.

Osuna then testified on *voir dire* that he interviewed defendant a third time on September 25. At that time defendant was out on bail. According to Osuna, defendant called Inspector Pedrini and said that he wanted to talk with Pedrini and Osuna. When defendant arrived, he was again advised of his rights and said that he understood them. Osuna did not ask defendant to sign the waiver card on this occasion.

Inspector Pedrini testified on the *voir dire* that he was present at the first and third interviews, that on each of these occasions defendant was advised by Osuna of his constitutional rights, that defendant stated he understood them, and that he then gave a statement to Osuna.

Defendant took the stand at the *voir dire* hearing and testified that he

---

[4]The *voir dire* hearing took place out of the presence of the jury.

[5]These admonitions comport with the requirements of *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], respecting warnings to be given a suspect or accused before any interrogation.

was not advised of his rights on any of the occasions testified to by Osuna and Pedrini and that he at no time made any statement to them. Defendant denied that he approached Osuna on September 23. Concerning the third interview, he testified that he merely called Pedrini to ask for help in getting his clothes from the jail. Defendant stated that at Pedrini's suggestion he came to the police station, and when he got there "he was ushered into the interrogation room by Inspector Osuna."

At the conclusion of the *voir dire* hearing defendant's counsel made no specific objection but merely stated that the prosecution had "not sustained the burden of showing there was, in fact, an admonition." The court, upon submission of the matter, and under its prerogative to resolve the conflicts in the evidence, found that defendant was properly admonished.

Following the *voir dire* hearing Osuna took the stand as a prosecution witness. He testified that at the first interview on September 22 defendant's "first statement was he does not desire to talk, to talk about the case." In reply to the district attorney's inquiry "And what happened next?", Osuna stated he "asked him a few other questions and we talked back and forth, . . ." Pursuant to this questioning, defendant gave personal information concerning his birth, lack of military service, and welfare status. Defendant stated that certain checks which had been found in his room had been there when he rented the room, and that all of the other property found in his room belonged to him. He stated that he had bought such property more than a year earlier from Macy's, The Emporium, and a friend, and that he purchased it with cash which he had obtained when his mother died and left him an inheritance. He could not explain why labels had been removed from some of the clothing. When asked about merchandise returned to Macy's, defendant did not answer. However, he did deny that he ever used the name Marshall Peters.

On the occasion of the second interview on September 23, Osuna testified that defendant stated his true name was Marshall Lee Peters, and provided other personal information. He did not answer when asked whether he had gone into Macy's with a truck. Instead, he said he had gone to the store and had been allowed in by Stewart. He went into Macy's by himself four or five times and obtained hi-fi equipment and clothing, which he sold to a man named Rose for approximately $1,400 and some "speed." He said that he went into Macy's on Friday nights. He described his friendship with Stewart. When asked why he used the name Szurek, he said he had been in trouble and consequently had decided to use an alias.

Osuna testified that on the third interview on September 25, defendant

at that time gave him three pawn tickets and stated that he had also pawned merchandise under the name of Dill. Osuna also stated that the property which had been pawned was retrieved from the pawnbroker and was subsequently determined to have come from Macy's.

The People concede that when defendant declined to sign the waiver card and stated that he did not desire to talk about the case Osuna was obligated to terminate the interrogation. They also concede that the subsequent interviews were not independent of Osuna's first interrogation in which defendant stated that he did not want to discuss the case. In essence, the People thereby concede that there was *Fioritto* error. In *People* v. *Fioritto,* 68 Cal.2d 714 [68 Cal.Rptr. 817, 441 P.2d 625], it was held that when the *Miranda* warnings have been given any interrogation must cease " 'If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, . . .' " (at p. 718), and that once the individual asserts his constitutional rights a confession thereafter secured is inadmissible at trial. (At p. 719.) (See also *People* v. *Randall,* 1 Cal.3d 948, 954-955 [83 Cal.Rptr. 658, 464 P.2d 114].) The introduction of a confession so obtained is prejudicial per se and requires reversal. (*People* v. *Fioritto, supra,* at p. 720; *People* v. *Randall, supra,* at p. 958.)

■ The People contend, however, that notwithstanding such error, defendant is precluded from asserting it on appeal because a proper objection to the admissibility of the subject statements was not interposed in the court below. (See Evid. Code, § 353.) In considering this contention we observe that the *Fioritto* implication occurred subsequent to the aforementioned *voir dire.* It was while Osuna was testifying on direct examination in the case in chief that he first disclosed that defendant, at the time he was admonished of his *Miranda* rights at the first interview, indicated he did not desire to talk about the case. However, no objection was interposed then or at any other time that defendant's statements were obtained in violation of the proscription in *Fioritto.*

It is apparent from the foregoing that defendant did not at any time make a specific objection on the ground that, although defendant may have been given the proper *Miranda* warning, the statements were obtained after defendant had invoked his Fifth Amendment privilege in violation of the proscription delineated in *Fioritto* and in *People* v. *Ireland,* 70 Cal.2d 522, 535 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323]. ■ It is, of course, the general rule that a person who desires to raise on appeal the point that inadmissible evidence has been erroneously admitted, must object at the trial by specifically stating the grounds of his objection and

directing his objection to the particular evidence he seeks to exclude. (*People* v. *Fontaine,* 237 Cal.App.2d 320, 329 [46 Cal.Rptr. 855]; *People* v. *Prado,* 190 Cal.App.2d 374, 378 [12 Cal.Rptr. 141]; *People* v. *Willis,* 30 Cal.App.2d 419, 421 [86 P.2d 670]; see Evid. Code, § 353.)

█ There is abundant authority in this state that if there is no objection at the trial to the admission of a confession or of statements obtained in violation of *Miranda,* the objection cannot be raised for the first time on appeal. (See *In re Dennis M.,* 70 Cal.2d 444, 462 [75 Cal.Rptr. 1, 450 P.2d 296]; *People* v. *Superior Court,* 15 Cal.App.3d 146, 150, fn. 1 [92 Cal.Rptr. 916]; *People* v. *Simms,* 10 Cal.App.3d 299, 310 [89 Cal. Rptr. 1]; *People* v. *Carter,* 7 Cal.App.3d 332, 339 [88 Cal.Rptr. 546]; *People* v. *Patterson,* 270 Cal.App.2d 268, 272, fn. 1 [75 Cal.Rptr. 485]; *People* v. *Figueroa,* 268 Cal.App.2d 721, 727 [74 Cal.Rptr. 74]; *People* v. *Duty,* 269 Cal.App.2d 97, 105 [74 Cal.Rptr. 606]; *People* v. *Jackson,* 266 Cal.App.2d 341, 349 [72 Cal.Rptr. 162]; *People* v. *Myers,* 262 Cal. App.2d 307, 310-311 [68 Cal.Rptr. 636]; *People* v. *Castro,* 257 Cal. App.2d 643, 645-646 [65 Cal.Rptr. 62]; *People* v. *Ray,* 252 Cal.App.2d 932, 958 [61 Cal.Rptr. 1]; *People* v. *Crooks,* 250 Cal.App.2d 788, 793 [59 Cal.Rptr. 39]; *People* v. *Sanchez,* 239 Cal.App.2d 51, 55 [48 Cal. Rptr. 424].) █ No California case has come to our attention, however, which deals with the effect of the failure to object to a confession or statement obtained in violation of *Fioritto.*

In *Fioritto, Ireland* and *Randall* the confession or extrajudicial statement held to be prejudicial per se was introduced into evidence over objection, as was the case in *People* v. *Burton,* 6 Cal.3d 375, 382-387 [99 Cal.Rptr. 1, 491 P.2d 793], a decision which recently reiterated the rule of *Fioritto, Ireland* and *Randall.*[6]

In determining whether the *Fioritto* infirmity is waived by the failure to object to the statement or confession we must reconcile the holdings in *Fioritto, Ireland, Randall* and *Burton,* i.e., that a confession obtained from a defendant in violation of the *Fioritto* proscription is prejudicial per se and compels reversal of the judgment, with the holdings in the cases cited above that a *Miranda* infirmity can be waived by the failure to object. In making this determination we observe that the rule articulated in *Fioritto,* and reiterated in *Ireland, Randall* and *Burton,* has its genesis in *Miranda* and is clearly an application of a *specific* "protective device" embraced in the *Miranda* rule. (See *People* v. *Fioritto, supra,* 68 Cal.2d at pp. 717-719.)

---

[6]The opinion in *People* v. *Fioritto, supra,* 68 Cal.2d 714, does not disclose whether an objection was made to the admissibility of the confession. However, the record on appeal to which we have access and which we judicially notice (Evid. Code, §§ 452, 459) indicates that such an objection was made.

We take cognizance, too, of defendant's strong reliance upon *In re Cameron,* 68 Cal.2d 487 [67 Cal.Rptr. 529, 439 P.2d 633], which holds that where a confession is involuntary as a matter of law, a defendant is not precluded, by his failure to object, from raising the issue for the first time on appeal (at p. 503), and of his reliance upon the statement in *Randall* that a confession obtained in violation of *Fioritto* "cannot be characterized as voluntary." (1 Cal.3d at p. 958.) We here point out that in *Cameron* the court was dealing with a confession obtained while the defendant was substantially under the influence of Thorazine during the interrogations under consideration.

Turning to the crux of the issue before us, we observe that in *Fioritto* the confession there held to be violative of constitutional guarantees and prejudicial per se was not characterized as "involuntary" but was held to be constitutionally infirm because it violated the proscription of *Miranda* which requires the police to cease all interrogation once the defendant has invoked his constitutional right to remain silent. We do observe, however, that *Fioritto* cites and relies upon the following language in *Miranda* that " 'any statement taken after the person invokes his [Fifth Amendment] privilege cannot be other than the product of compulsion, subtle or otherwise.' . . . (384 U.S. 436, at pp. 473, 474 . . . .)" (68 Cal.2d at p. 718.) In *Randall* the Supreme Court expounds upon the characterization that a statement obtained in violation of *Fioritto* is not voluntary as meaning that such police-initiated interrogation "*cannot* produce voluntary waivers or spontaneous statements." (1 Cal.3d at p. 958.)

The apparent thrust of *Fioritto* and *Randall* is that any statement or confession obtained by police interrogation after a defendant has invoked his constitutional right to remain silent is not voluntary, and, if admitted over objection, results in prejudicial error. There is nothing in these cases that suggests that a *Fioritto* violation suffers from the same infirmity inherent in the coerced confession.

The cases recognize a distinction between involuntary confessions having their genesis in coercion and confessions obtained in violation of *Miranda.* In the former, the confession is untruthful because coerced; in the latter, the confession is not deemed to be inherently unreliable and hence more trustworthy than the coerced confession, and "far less offensive to the underlying principles in the enforcement of our criminal laws." (*People* v. *Castro, supra,* 257 Cal.App.2d at p. 646; and see *In re Lopez,* 62 Cal.2d 368, 372-378 [42 Cal.Rptr. 188, 398 P.2d 380]; *People* v. *Underwood,* 61 Cal.2d 113, 120 [37 Cal.Rptr. 313, 389 P.2d 937].) In *Castro* it was observed that if it were not for this difference the United States Supreme Court, in *Johnson* v. *New Jersey,* 384 U.S. 719 [16 L.Ed.2d 882, 86 S.Ct.

1772], and the California Supreme Court, in *People* v. *Rollins*, 65 Cal.2d 681 [56 Cal.Rptr. 293, 423 P.2d 221], would not have held that the application of the *Miranda* rule is not retroactive. (257 Cal.App.2d at p. 646.)[7] To put it another way, if the violation of *Miranda* was deemed to be tainted with the same fundamental unfairness found in a coerced confession, *Miranda* would have been applied retroactively as has been done in the coerced confession cases. (See *Reck* v. *Pate*, 367 U.S. 433 [6 L.Ed.2d 948, 81 S.Ct. 1541]; *In re Lopez, supra,* at pp. 373-380; and see *Jackson* v. *Denno*, 378 U.S. 368, 390 [12 L.Ed.2d 908, 923, 84 S.Ct. 1774, 1 A.L.R.3d 1205].)

We hold, therefore, that since the holding in *Fioritto* is, in essence, an expression of the *Miranda* principle, the rule that the failure to object to *Miranda* error at the trial cannot be raised for the first time on appeal is equally applicable to *Fioritto* error. We observe, moreover, that "The requirement of timeliness for an evidentiary objection serves a practical purpose in the legal order." (*People* v. *Carter, supra,* 7 Cal.App.3d 332, 339; see *People* v. *Myers, supra,* 262 Cal.App.2d 307, 311; *In re Dennis M., supra,* 70 Cal.2d 444, 462.) When an objection is made at the trial on the basis that a confession violates the rule declared in *Fioritto,* both the prosecution and the defense have the opportunity to meet the issue and explore the circumstances under which the statement was secured, by the introduction of evidence showing such circumstances. Thereupon the court may properly and knowledgeably rule on the contention and thereby admit or reject the confession on the basis of the showing before it. In the absence of any objection tendering such issue, the trial court is justified in assuming that no contention is made by the defendant that the confession is tainted because it violates the *Fioritto* proscription. (See *People* v. *Carter, supra.*)

## Homosexual Relationships

On cross-examination Stewart was asked questions intended to explore the possibility that he testified because of homosexual jealousy toward defendant. He acknowledged that he was a good friend of defendant and had a "sort of an attachment with him." However, he denied any jealousy as a result of the attachment. Stewart was then asked if he knew that Ernie Braidlow's place was a male house of prostitution. The prose-

---

[7]*Castro* also notes that in *In re Lopez, supra,* 62 Cal.2d 368, the Supreme Court held that the principles established in *Escobedo* v. *Illinois*, 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], and followed in *People* v. *Dorado*, 62 Cal.2d 338 [42 Cal. Rptr. 169, 398 P.2d 361], were not to be applied retroactively. *Miranda* is based on *Escobedo* and provides for more detailed guidelines in applying the *Escobedo* principle.

cution objected, and defense counsel stated that the evidence was essential to show that Stewart associated with homosexuals, a fact tending to corroborate the assertion that Stewart was testifying out of homosexual jealousy. The court stated its belief that the prejudicial effect of the offered testimony outweighed its probative value. The court later added that it would not permit defense counsel to suggest that Stewart should not be believed just because he was a homosexual.

The fact that a person is a homosexual does not per se make his testimony suspect and evidence proffered for such purpose is inadmissible, since it purports to present evidence of traits of the witness's character other than honesty or veracity. (Evid. Code, § 786; *People* v. *Rowland,* 262 Cal.App.2d 790, 796 [69 Cal.Rptr. 269].) Evidence of homosexuality or a homosexual relationship is admissible, however, to prove bias, interest or motive of a witness. (Evid. Code, § 780, subd. (f); *People* v. *Rowland, supra; People* v. *Dukes,* 241 Cal.App.2d 488, 492-493 [50 Cal.Rptr. 609]; *People* v. *Mullen,* 115 Cal.App.2d 340, 342 [252 P.2d 19].)

In the present case the evidence sought to be elicited was irrelevant to the issues. Although defense counsel's initial inquiry into the possibility that Stewart might be testifying against defendants out of homosexual jealousy was properly admitted because the offered evidence did have a reasonable tendency to establish Stewart's bias, interest or motive, the question concerning whether Stewart frequented Braidlow's place, an alleged homosexual hangout, did not have any direct bearing on Stewart's credibility on the basis of interest, bias or motive; rather, it suggested that Stewart ought not to be believed because he was a homosexual. The evidence was inadmissible for such purpose. (*People* v. *Rowland, supra,* 262 Cal.App.2d 790, 796; Evid. Code, § 786.) In any event, we apprehend that the proffered evidence was of such a nature that its probative value was substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice and of confusing the issues so as to warrant its exclusion in the discretion of the court. (Evid. Code, § 352.)

### The Shortages

Stanley Volansky, a "shortage control analyst" at Macy's, testified concerning shortages at Macy's northern California stores during the years 1967 through the first half of 1969. An objection that the evidence was irrelevant and prejudicial was overruled. Volansky then identified various items which had been taken from defendant's apartment as being Macy's merchandise with serial numbers or brand names matching merchandise

which had been found to be missing. On cross-examination he acknowledged that he could not tell whether the merchandise was actually taken from the O'Farrell Street store, from other Macy's stores, or from the central warehouse. The court overruled objections to Volansky's testimony, but sustained an objection to the introduction of exhibits used by Volansky in demonstrating Macy's shortages. The court ruled that the evidence of the shortages was properly before the jury and could be argued by counsel.

Although defendant was charged only with pilferages at the O'Farrell Street store in San Francisco it would seem, therefore, that the absence of direct evidence that there were shortages at such store would render the evidence of shortages at other Macy's stores irrelevant and of no probative value. However, Volansky's identification of the items of merchandise as being Macy's merchandise, and his testimony that the serial numbers or brand names of said merchandise matched merchandise which had been missing gives relevancy to the testimony objected to when it is considered in connection with the other testimony to the effect that defendant worked in the Macy's O'Farrell Street store, that he pilfered merchandise therefrom, and that the merchandise identified by Volansky was found in defendant's apartment. " 'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) The subject evidence meets this definition.

### Use of Narcotics

On direct examination Osuna testified that defendant stated he had sold merchandise taken from Macy's to a man named Rose and received money and "speed" in exchange. This testimony was not objected to. The failure to object constitutes a waiver of any objection on appeal. (See Evid. Code, § 353, subd. (a); *People* v. *Corrigan*, 48 Cal.2d 551, 556 [310 P.2d 953]; *Russell* v. *Geis*, 251 Cal.App.2d 560, 569-570 [59 Cal.Rptr. 569]; *People* v. *Foster*, 271 Cal.App.2d 763, 765-766 [76 Cal.Rptr. 775].)

█ Officer Sully testified that when he and two other officers went to defendant's apartment on September 21 he observed codefendant Eagleton drop a hypodermic needle and a syringe on the floor. An objection to this testimony by defendant's counsel on the ground of irrelevancy was overruled and a motion to strike it was denied. No objection to such testimony was interposed by Eagleton's counsel, although he did object to the admission into evidence of the hypodermic needle and syringe. That objection was sustained. We perceive that there is no testimony that the subject needle and syringe constituted narcotic paraphernalia. Apparently it was defendant's apprehension that such an inference could be drawn as well as the

inference that he was jointly in possession of these items because they were in his apartment. With nothing more to connect defendant than the reference to these items, the relevancy of the subject testimony appears to be remote and the court should have sustained the objection on the ground of irrelevancy. However, any error in admitting such evidence was harmless. There is no evidence that the needle and syringe constituted narcotic paraphernalia. That the jury would so infer is a matter of speculation. In any event, even if there was error applying the test of article VI, section 4½ of the California Constitution and *People* v. *Watson*, 46 Cal.2d 818, 836 [299 P.2d 243], we are of the opinion, after an examination of the entire cause, including the evidence, that it is not reasonably probable that a result more favorable to defendant would have been reached in the absence of such error.

The judgment is affirmed.

Sims, J., and Elkington, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 12, 1972. Peters, J., was of the opinion that the petition should be granted.