[Crim. No. 6125. Fourth Dist., Div. Two. Nov. 25, 1974.]

THE PEOPLE, Plaintiff and Respondent, v.
TADASHI FUJITA et al., Defendants and Appellants.

## COUNSEL

Cohen, Stokke, Owen & Davis, Allan H. Stokke, Joseph A. Ball and Laurence F. Jay for Defendants and Appellants.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, A. Wells Petersen and M. Howard Wayne, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KERRIGAN, Acting P. J.**—The Mayor and the Planning Commissioner of the City of Westminster were charged with attempting to "shake down" a prosperous farmer for $10,000 on the pretext of obtaining favorable treatment for him from the board of supervisors in connection with the extension of an agricultural lease on a valuable piece of property held by the County of Orange.

The indictment against the mayor (Derek McWhinney) and the commissioner (Tadashi Fujita) contained five felony counts: (1) conspiracy to commit grand theft (Pen. Code, § 182, subd. 1); (2) attempted grand theft (Pen. Code, §§ 484, 487); (3) conspiracy to commit bribery (Pen. Code, § 182, subd. 1); and (4) and (5) solicitation of bribery (Pen. Code, § 653f).

Both officials were convicted by a jury of the two theft counts and acquitted of the three bribery charges. The mayor was sentenced to the state prison for conspiracy to commit grand theft, but was released on bail pending appeal. The commissioner was likewise sentenced to state prison for conspiracy to commit grand theft; however, execution of the sentence was suspended and probation granted on condition that he serve six months in jail and pay a $2,500 fine.

## FACTS

In 1967, the County of Orange acquired a long-term leasehold interest in a large parcel of land in Fountain Valley known as Mile Square from the federal government for the purpose of developing it as a park and recreational area. Inasmuch as long-range planning and substantial revenues would be necessary for construction of the proposed improvements, the county decided to lease the land on a short-term basis for farming purposes. In June 1967, after the usual bidding procedures had been complied with, the county entered into a five-year lease with the sole bidder, George Murai, at an annual rental of $75-$100 per acre. In turn, Murai eventually subleased a portion of the acreage to George Tanaka.

By 1972, Murai was farming about 115 acres and Tanaka about 100. Both raised strawberries, tomatoes, cucumbers and cabbage, with strawberries and tomatoes being the dominant and most lucrative crops.

Murai's lease was to expire on June 30, 1972. With crops still in the ground to be harvested and future plantings to be considered, he began negotiations with the county department of real property services (RPS) for an extension of his lease.

On June 14, Murai and RPS signed a one-year extension at $150 an acre, with the proviso that the agreement was subject to the approval of the board of supervisors ("Board"). However, the same day the agreement was signed, RPS informed Murai that the extension "was off" as a number of people had expressed an interest in the property and the lease would be subject to competitive bidding. But on June 20 the county executed a "hold-over" agreement granting Murai possession until September 30

so that he and Tanaka could harvest the crops which would still be in the ground when the lease expired on June 30.

The county's decision to place the land up for bid (causing RPS's cancellation of its one-year lease extension with Murai) resulted from the defendant McWhinney's efforts to accomplish that purpose. McWhinney realized that Murai's lease was about to expire inasmuch as he had assisted Murai in getting the lease in the first place. He had been informed that other growers or produce firms were interested in Mile Square.

In January 1972, he got a copy of Murai's lease from RPS. In May or early June, he met with the president of Cal-Fruit, a produce brokerage firm. McWhinney was informed that Cal-Fruit would pay up to $325 an acre for the parcel and that if McWhinney helped Cal-Fruit to obtain the lease at a lower figure, he "could do what he liked" with the differential under $325.

McWhinney contacted Supervisor Battin's administrative assistant and suggested that Mile Square be broken up and put out to bid for a minimum bid of $250 an acre. The administrative assistant discussed the matter with Battin and Battin was also contacted by McWhinney who lobbied for the breaking up of the property, suggesting it be bid out in parcels.

McWhinney contacted the administrative assistant to Supervisor Ronald Caspers and suggested that it might be beneficial to the county to divide up Mile Square in order to allow it to be bid upon by small farmers and thus solicit more competitive bidding. He also spoke to Caspers and pressured him to deny the extension of Murai's lease, split the property and put it up for bid.

On the same day Murai was informed by RPS of the cancellation, McWhinney visited Murai and told him that members of the Board were unhappy that he had not made any campaign contributions; Murai replied he had contributed to Battin's campaign;[1] McWhinney stated, "I put you in there and I can get you out." He then left, telling Murai he was going to have lunch with one of the supervisors.

The Board's agenda for June 27 was prepared and included ratification of Murai's three-month hold-over agreement and RPS's recommendation that Mile Square be put out for bidding. On that date, the Board approved Murai's three-month hold-over agreement and remanded the matter to

---

[1]McWhinney sat on the sanitation district board with Battin and Mile Square was in Battin's district; he also was a member of the Orange County Transit District. In addition, he had married Supervisor Caspers' secretary.

RPS with instructions to prepare "bidding packages" for three separate parcels.

The same day, Murai either contacted, or was contacted by, the defendant Tad Fujita—a mutual friend of Murai and McWhinney.[2] Murai wanted to know what McWhinney was up to. Fujita and Murai met at a coffee shop. Fujita told Murai that McWhinney could make it "tough" for him because of his political influence with the supervisors if he did not cooperate.

On July 7, 1972, Murai again met with Fujita at the same coffee shop. Their conversation may be capsulized as follows: Fujita suggested Murai should do what McWhinney wanted and make out a $5,000 check payable to Supervisor Battin and also give McWhinney $5,000 in cash; Fujita said McWhinney knew the right people and $10,000 wasn't a lot of money in view of what it would cost Murai to meet the cost of the proposed bid (the $250 an acre minimum bid amounted to a $20,000 increase over the $150 per acre provided in the aborted extension agreement); Fujita warned Murai not to contact the district attorney since he and McWhinney both knew Cecil Hicks (the D.A.).

In late June or early July, Murai reported the affair to the district attorney's office. On July 19, 1972, he appeared before the Orange County Grand Jury and agreed to make phone calls to the defendants and have the same recorded. As a result, several calls were made, recorded and transcribed.

On July 20, Murai phoned McWhinney and they agreed to meet at a Westminster coffee shop the following morning. Through prearrangement with Murai, a district attorney's investigator was present in the next booth. The investigator overheard the following portions of the conversation and took notes of the conversation on napkins: Murai and McWhinney talked about "supervisors" and "land"; Murai said that the land was worth nothing; McWhinney replied it was good berry land; McWhinney said, "You recall when I first talked to you about the property?" and "You still need the property"; Murai said he had already contributed to Battin's campaign; McWhinney said Murai should give the money to Fujita; when Murai asked if the money would be returned if the Board did not approve the lease, McWhinney assured him "It can be taken care of"; Murai said he would call Fujita and get details arranged.

On July 21, Murai called Fujita; Fujita said that McWhinney had

[2] Defendant Fujita leased farm land from defendant McWhinney's family business (Westminster Memorial Park).

given him instructions, but complained that he wasn't getting anything out of it and should charge the other two something for his time and efforts as a middleman; Murai stated it was a rotten deal; Fujita said, "I've always believed in you scratch my back and I'll scratch your back, you know, when necessary."

Following the telephone conversation of July 21, Murai and Fujita met: Fujita told Murai to put $5,000 in cash in an envelope and take it to Fujita's office; he also told Murai to include a letterhead from Murai Farms so McWhinney could write a letter on his behalf to the supervisors.[3]

On July 24 (11:50 a.m.), Murai called McWhinney; Murai said he had talked to Fujita and Fujita wanted $5,000 in cash and the letterhead; McWhinney replied that Murai should work it out with Fujita and ". . . I'm not going to get involved . . . in anything at all." The letter to the supervisors was also discussed but McWhinney refused to discuss money.

At 3:53 p.m. Murai and Fujita talked by phone. Their conversation was as follows: Fujita indicated he thought McWhinney could help Murai, but that McWhinney was worried that Murai was ". . . going to try to pull a fast one . . ." by going to the grand jury; Fujita said he tried to reassure McWhinney that Murai would not take such a course of action and claimed that he told McWhinney that Murai ". . . can't afford it . . . he's just as guilty as you [McWhinney] are if something goes wrong. . . ." Fujita further told Murai ". . . I'm sure you don't want to get involved because once . . . the thing comes up . . . in the public eye . . . then it's a big stink. So I mean I'm sure you don't want that either."

Following the foregoing conversation, Murai took $5,000 in cash in a Murai Farms envelope, went to Fujita's office and gave him the money. A district attorney's investigator entered the office two minutes after Murai's arrival and seized the Murai Farms envelope, the Murai Farms stationery and the $5,000 cash. Fujita was placed under arrest. McWhinney's arrest followed.

The indictment was returned on August 30. On September 5, the board

---

[3]After the Board directed RPS to place Mile Square up for bids, McWhinney asked Battin's administrative assistant what could be done to get the supervisors to abandon the three-parcel approach and extend Murai's lease for another year. The administrative assistant was surprised by McWhinney's about-face and replied that Murai should write to the supervisors and appear at the next meeting and emphasized that the letter would have to be submitted by July 25, the deadline for the Board's next agenda. It was agreed that after the letter was sent, McWhinney would pursue the matter by lobbying. On July 21, McWhinney told Fujita that it was rather late to help Murai but he would do what he could if Murai would pay and that he would need some of Murai's stationery for the letter to the Board.

of supervisors approved a bid package for Mile Square comprising three parcels with a minimum bid of $150 per acre. Two parcels were awarded to Murai and one parcel to Tanaka. Cal-Fruit only submitted a nominal bid because of the notoriety engendered by the charges against McWhinney and Fujita.

### DEFENSE

McWhinney took the position that the $10,000 to be paid by Murai was in exchange for his services in helping Murai obtain the leasehold on Mile Square; in other words, for his lobbying skills. Both he and Fujita denied that there was any plot to bribe the supervisors; rather, it was a straight business deal.

McWhinney's testimony may be summarized as follows: Initially, he was acting in behalf of Cal-Fruit in an endeavor to convince RPS and the supervisors to put Mile Square out for bid; he told Murai of his efforts because they were friends and he did not want to do anything behind his back; after he convinced RPS and the Board that it would be in the best interests of the county to put the property up for bids, he began to have doubts as to whether open bidding would produce a multiplicity of bidders as Murai had actual possession until September 30 and the value of the parcel for strawberry farming would be depressed to anyone but Murai because the "winter" planting season would be coming up so soon after a new tenant could take occupancy as not to give the new tenant time to prepare for such a planting; that he would look foolish to the county should the result be a paucity of bidders; that Murai had asked him for help; that he had agreed to help for $10,000; that the $5,000 down was to be returned if he failed to obtain the extension but he was to be paid $5,000 more if he were successful. In other words, it was to be a contingent business arrangement; no one was to be bribed; no one was to be defrauded.

Fujita denied any wrongdoing and testified he was only acting as a mutual friend of both men and that Murai had asked him to intercede with McWhinney to help him (Murai) retain his lease on the Mile Square property.

### ISSUES

The defendants raise the following issues: (1) insufficiency of the evidence to sustain the attempted grand theft by false pretenses conviction; (2) insufficiency of the evidence to establish conspiracy to commit grand theft by false pretenses; (3) transcripts of the telephonic tape recordings were improperly given to the jury; (4) the jury was not properly

instructed on the requisite intent for establishing theft by false pretenses; and (5) the grand jury proceedings which resulted in the indictment were unfair.

### FALSE PRETENSES

The crime of theft by false pretenses consists of three elements: (1) the making of a false pretense or representation by the defendant, (2) the intent to defraud the owner of his property, and (3) actual reliance by the owner upon the false pretense in parting with his property. (*Perry* v. *Superior Court*, 57 Cal.2d 276, 283 [19 Cal.Rptr. 1, 368 P.2d 529]; *People* v. *Ashley*, 42 Cal.2d 246, 259 [267 P.2d 271], cert. den., 348 U.S. 900 [99 L.Ed. 707, 75 S.Ct. 222]; *People* v. *Randono*, 32 Cal.App. 3d 164, 172 [108 Cal.Rptr. 326]; *People* v. *Brady*, 275 Cal.App.2d 984, 995 [80 Cal.Rptr. 418]; 1 Witkin, Cal. Crimes (1963) § 400, pp. 372-373.) However, in proving attempted theft by false pretenses, no reliance upon the false representation need be shown. (*People* v. *Camodeca*, 52 Cal.2d 142, 146-147 [338 P.2d 903].)

Thus, defendants' conviction on the charge of attempted theft by false pretenses may not be overturned by this court if substantial evidence exists to conclude that said defendants made a false representation to Murai, with the intent to defraud him of his property.

First we turn to the sufficiency of the evidence regarding the making of the false pretense. Historically, the law required that the false representation be one of *present fact*, but since *People* v. *Ashley, supra,* 42 Cal.2d 246, a *promise* of future performance has been a sufficient representation upon which to base a charge of theft by false pretenses. But mere nonperformance of a promise is not enough to establish the falsity of the pretense. (See also *People* v. *Weitz*, 42 Cal.2d 338 [267 P.2d 295], cert. den., 347 U.S. 993 [98 L.Ed. 1126, 74 S.Ct. 859]; *People* v. *Randono, supra,* 32 Cal.App.3d 164.)

Proof of a false representation may be established by either words or conduct, or by both. "[T]he form of the words in which the pretense is couched is immaterial; if the words or conduct are intended to create the impression that [the] defendant is making a representation . . . the pretense is within the statute." (*People* v. *Brady, supra,* 275 Cal.App.2d 984, 996; *People* v. *Randono, supra,* 32 Cal.App.3d 164, 177-178; 1 Witkin, Cal. Crimes (1963) § 404, p. 376.) Hence, the words of the defendants, their conduct, the nonperformance of their alleged promise, and other circumstances of the "shake down" must all be considered in determining whether defendants' promise constituted a false pretense

within the meaning of section 484 of the Penal Code. (*People* v. *Gibson,* 275 Cal.App.2d 198, 208-209 [79 Cal.Rptr. 693]; *People* v. *Frankfort,* 114 Cal.App.2d 680, 688-690 [251 P.2d 401].)

 There is solid evidence indicating that McWhinney and Fujita told Murai that they needed his money to "pay off" the Board inasmuch as the supervisors were unhappy with him because of his paucity of campaign contributions. McWhinney implied he had great influence with the supervisors regarding disposition of the Mile Square leasehold. He had demonstrated that influence when the supervisors, following his suggestion, had prepared to put Mile Square up for bid in three parcels. Fujita had interceded as an intermediary between Murai and McWhinney, and demanded a $10,000 payment from Murai in order to insure the latter's continued occupancy of the property. Murai was told that $5,000 of this sum was to go to Supervisor Battin's campaign fund. Clearly, McWhinney and Fujita, by their words and their conduct, intended Murai to understand that he would have to make up for his reluctance to contribute to the supervisors' election campaigns if he expected to retain his interest in Mile Square.[4]

No evidence was produced at trial to indicate that either Fujita or McWhinney ever approached a supervisor (or an agent thereof) with an offer of campaign contributions (or bribes) from Murai in exchange for a renewal of Murai's lease. (McWhinney did, however, attempt to "lobby" for Murai, using non-monetary influence with the supervisors and their staff members.)

In *People* v. *Gibson, supra,* 275 Cal.App.2d 198, sufficient evidence of a false representation was found based upon similar circumstantial evidence. Gibson was indicted on two counts of conspiracy to commit bribery and two counts of grand theft by false pretenses and his two partners were also indicted as co-conspirators on the bribery counts. Gibson told his partners that he needed money to insure that a particular parcel in downtown Los Angeles would be rezoned to their advantage, and advised his partners "it's better not to know where the money goes." The district attorney argued that if a bribery scheme was not established, Gibson must have obtained the funds by falsely representing that the

---

[4]It is immaterial whether defendants indicated that the money was to be used to "bribe" Board members or was to be employed as "campaign contributions." Likewise, it is immaterial what form (e.g., cash or check) the supposed pay off was to take. Both defendants insisted that McWhinney intended to keep all the money Murai handed over to them. Thus, the essence of the false representation was that money had to be "channeled" to Board members to preserve Murai's lease, and this representation was false.

money was to be used as a bribe. At trial no evidence was produced indicating that Gibson ever offered to "pay off" any member of the city Planning Commission. Gibson was found guilty of theft by false pretenses; his partners were acquitted of the bribery charges; and the reviewing court found sufficient evidence to sustain Gibson's conviction of theft by false pretenses.

Similarly, it may reasonably be deduced from the statements and conduct of the defendants herein, coupled with the circumstances of the transaction, that Murai was being "shaken down" for $5,000 which obtensibly was to be used to buy favor, in some form, from the Board. But the defendants (by their own admission) never intended to convey any part of Murai's money to the Board or any member thereof. The false pretense element is supported by sufficient evidence.

■ Second, the issue arises whether there is substantial evidence of the defendants' intent to defraud Murai. Again, nonperformance or actual falsity is not enough to establish intent. (*People* v. *Ashley, supra,* 42 Cal.2d 246, 265.) ■ Intent to defraud is a question of fact to be determined from all the circumstances of the case, and usually must be proven circumstantially.[5] (*Perry* v. *Superior Court, supra,* 57 Cal.2d 276, 285; *People* v. *Frankfort, supra,* 114 Cal.App.2d 680, 697-698.)

In the past, California courts have had to look for behavior on the part of defendants consonant with an intent to defraud or, at least, knowledge that the representations made were false. (See *Perry* v. *Superior Court, supra,* 57 Cal.2d 276, 285; *People* v. *Brady, supra,* 275 Cal.App.2d 984, 995-996.) ■ But defendants took the position that they never intended to use any of Murai's payments to bribe, "pay off" or otherwise purchase favor from the Board. The evidence adduced at trial indicated that the defendants, by word and deed, managed to create the impression that Murai needed, through McWhinney, to get money to the supervisors in order to retain his lease. The fact of such a contrived false promise (e.g., to pay off the board of supervisors), coupled with defendants' intention to make no such payments, leads one to the unavoidable conclusion that the defendants intentionally employed a false representation to defraud Murai of his money.

■ Third, section 1110 of the Penal Code requires that corroboration

---

[5]"This is so because intent is inherently difficult to prove by direct evidence. Therefore, the act itself, together with its surrounding circumstances must generally form the basis from which intent of the actor may be legitimately inferred." (*People* v. *Burnham,* 194 Cal.App.2d 836, 841 [15 Cal.Rptr. 596], quoting from *People* v. *Proctor,* 169 Cal.App.2d 269, 279 [337 P.2d 93].)

be had of a theft victim's accusation. The statute requires that only the *false pretense* be "proven by the testimony . . . of one witness and corroborating circumstances." (See *People* v. *Ashley, supra,* 42 Cal.2d 246, 259; *People* v. *Andrews,* 165 Cal.App.2d 626, 639 [332 P.2d 408]; *People* v. *Beilfuss,* 59 Cal.App.2d 83, 91-92 [138 P.2d 332], app. dism. and cert. den., 321 U.S. 746 [88 L.Ed. 1048, 64 S.Ct. 529].)

Defendants argue that the corroboration required by section 1110 must be "self-sufficiently substantial . . . substantial evidence independent of the one witness' testimony, which per se tends to show that the defendant uttered the false pretense." We believe that defendants overstate the corroboration standard.[6]

■ Corroborating evidence is sufficient if it tends to connect the defendant with the commission of a crime in such a way so as to reasonably satisfy the jury that the complaining witness is telling the truth; the corroboration is inadequate if it requires aid from the testimony of the witness to be corroborated in order to connect the defendant with the alleged offense.[7] (*People* v. *MacEwing, supra,* 45 Cal.2d 218, 225; *People* v. *Frankfort, supra,* 114 Cal.App.2d 680, 692.) Defendants claim that the corroborating evidence produced at trial fell short of the statutory standard. We disagree.

■ Corroborative evidence may be found in the circumstances connected with the transaction, the conduct of the defendant, and his declarations to other persons. (*People* v. *Randono, supra,* 32 Cal.App.3d 164, 173; *People* v. *Frankfort, supra,* 114 Cal.App.2d 680, 701.) ■ Since the corroborative evidence need only tend to implicate the defendant in the alleged illegal activity, it may be slight and entitled to little weight standing alone. (*People* v. *Lyons,* 50 Cal.2d 245, 257 [324 P.2d 556]; *People* v. *Thurman,* 28 Cal.App.3d 725, 729 [104 Cal.Rptr. 804]; *People* v. *Andrews, supra,* 165 Cal.App.2d 626, 639-640.)

■ We find the following facts to be corroborative of Murai's allegation that defendants demanded money of him to "pay off" the Board: McWhinney and Fujita indicated that $10,000 was required to secure the

---

[6]On the other hand, the People understate the requirement. The case law makes it clear that corroboration be something more than a "strengthening" of the one witness' testimony which makes the utterance of the false pretense "more probable."

[7]Prior to 1955, California courts found the term "corroboration" to have different meanings in different statutory contexts. But the Supreme Court in that year, in *People* v. *MacEwing,* 45 Cal.2d 218, 224 [288 P.2d 257] (in holding that the test of corroborative evidence was the same under Penal Code sections 1108 and 1111) indicated that different tests "for application of the several statutes relating to corroboration would be very confusing, and a distinction is not justified. . . ." Hence, the test set forth in *MacEwing* is applied herein to section 1110 of the Penal Code.

renewal of the lease; on July 20th, a conversation between Murai and McWhinney was overheard in which "contributions," "supervisors" and "the property" were all discussed; in a recorded telephone conversation between Murai and Fujita, the latter cautioned Murai not to go to the county grand jury because he, Murai, was "just as guilty" (suggesting that an illicit scheme was afoot).

The foregoing evidence indicates that the defendants were demanding money from Murai for what they wanted Murai to believe was an illegal purpose and that the Board was intimately involved in the scheme: This evidence, though inconclusive in itself, clearly implicates the defendants in the alleged false pretense without resort to Murai's testimony. It is specific enough to lend credence to Murai's testimony regarding the making of the false representation. It was sufficient to satisfy the statutory requirement of corroboration.

### CONSPIRACY

Defendants also argue that insufficient evidence was presented to find them guilty of conspiracy to commit grand theft by false pretenses. With this contention, we must also disagree.

A criminal conspiracy is an agreement between two or more persons that they will commit an unlawful object (or achieve a lawful object by unlawful means), and in furtherance of the agreement, have committed one overt act toward the achievement of their objective. (1 Witkin, Cal. Crimes (1963) § 105, p. 99.) A conspiracy to commit theft by false pretenses may be inferred from the close association of two defendants in promoting the illegal scheme. (*People* v. *Frankfort, supra,* 114 Cal.App.2d 680, 688-691.)

Defendants argue that no specific intent to defraud Murai was proven; hence, the conspiracy charge lacks an essential element. As indicated previously, the intent to defraud Murai is an almost unavoidable inference from the facts of this case.

Both defendants admittedly pressured Murai for the $10,000 payment. Both helped perpetuate the myth of McWhinney's proposed "pay offs": McWhinney by pressuring Murai for "campaign" contributions, and Fujita by stating that Murai and McWhinney were equally "guilty" in the scheme to obtain the renewal of the lease.

Defendants' challenge to the conspiracy conviction is really nothing more than a restatement of their argument that the substantive offense of attempted theft by false pretenses was not proved. Substantial evidence

supports both the conviction for the substantive offense and the conspiracy charge.

### Transcripts of Tape-Recorded Conversations

On a number of occasions following George Murai's first grand jury appearance on July 19, 1972, the Orange County District Attorney's office had Murai place phone calls to both of the defendants. These calls were tape-recorded. The recordings were played before the jury. The jury was provided with transcripts of these recordings. These transcripts were marked as exhibits and received in evidence. Subsequently, the jurors took these transcripts to the jury room during deliberations.

Defendants now assert that the receipt of these transcripts into evidence —and their subsequent carriage into the jury room—constitutes prejudicial error. We disagree.

■ Defendants' threshold problem is that they did not adequately preserve the objection to this evidence for appeal. Section 353 of the Evidence Code mandates that a party desiring to question an evidentiary ruling on appeal must make timely objection at trial, state the grounds of his objection, and direct the objection to the particular evidence he seeks to exclude. (*People* v. *Peters,* 23 Cal.App.3d 522, 529-530 [101 Cal.Rptr. 403], cert. den., 409 U.S. 1064 [34 L.Ed.2d 517, 93 S.Ct. 563]; *People* v. *Fontaine,* 237 Cal.App.2d 320, 329 [46 Cal.Rptr. 855], revd. on other grounds, 390 U.S. 593 [20 L.Ed.2d 154, 88 S.Ct. 1229].) Failure to make timely objection at trial constitutes a waiver of the right. (*People* v. *Peters, supra,* 23 Cal.App.3d 522, 530.)

Here defense counsel indicated during an *in camera* conference that they felt that providing transcripts of the telephonic recordings to the jury might prejudice the defendants by overemphasizing the contents of those conversations. But when the district attorney subsequently offered the transcripts in evidence in open court, defense counsel merely stated: "Subject to . . . what the jury will be advised of, yes, your Honor, we have *no objection.*" (Italics added.)

Assuming, arguendo, that defendants had objected to the propriety of the transcripts being admitted into evidence and carried to the jury room, there was no error in giving the jurors the transcripts.

■ Defendants' first objection to the admission of the transcript is that they overemphasized the evidence contained in the telephone conversations. But in order to find relevant evidence, which is otherwise admissible, inadmissible, it must be shown that it is of a prejudicial nature

such that it is likely to *mislead* the jury into convicting an innocent man. (Cf. *People* v. *Delgado,* 32 Cal.App.3d 242 [108 Cal.Rptr. 399].) Defendants show no prejudice. They simply make the bold assertion that written transcripts, per se, must be prejudicial. In fact, defendants concede (quoting from McWhinney's opening brief) that "the transcripts contained nothing probative either of a false pretense or of an intent to defraud." In light of the content of these transcripts, defendants' contention that they were prejudiced by the overemphasis of this evidence is not persuasive.

Defendants also argue that these transcripts were not the best evidence, and, hence, should not have been admitted. A long line of cases in this state has held that neither recordings nor transcripts of recordings are subject to objection as not being the best evidence; it is reasoned that their great reliability warrants their use. (See *People* v. *Finch,* 216 Cal.App.2d 444, 454 [30 Cal.Rptr. 901], cert. den., 377 U.S. 990 [12 L.Ed.2d 1044, 84 S.Ct. 1907]; *People* v. *Albert,* 182 Cal. App.2d 729, 741-742 [6 Cal.Rptr. 473]; *People* v. *Wojahn,* 169 Cal. App.2d 135, 146 [337 P.2d 192]; *People* v. *Stephens,* 117 Cal.App.2d 653, 660 [256 P.2d 1033].)

Defendants next argue that even if the transcripts were properly admitted into evidence, it was error for them to be taken into the jury room during deliberations. But section 1137 of the Penal Code provides that the jurors, upon retiring for deliberation, may take with them all papers which have been received into evidence (except depositions). Moreover, there is judicial authority that transcripts of tape-recorded testimony may be taken into the jury room. (*People* v. *Beverly,* 233 Cal.App.2d 702, 718, cert. den., 384 U.S. 1014 [16 L.Ed.2d 1035, 86 S.Ct. 1937].)[8]

### JURY INSTRUCTIONS

Defendants contend that the trial judge erred in improperly instructing the jury on the requisite specific intent for establishing theft by false pretenses. In a criminal case, even when not requested to do so, the trial court must instruct the jury on the general principles of law raised by the evidence. At a minimum, it is required that the jury be instructed on all elements of the case submitted to it (*People* v. *Iverson,* 26 Cal.App.3d 598, 604-605 [102 Cal.Rptr. 913].) The fact that de-

---

[8]Defendants also claim the transcripts constitute hearsay, but they make no real showing tending to support the argument. Such evidence, though it be hearsay, is admissible under the admission exception to the hearsay rule. (Evid. Code, § 1220; Witkin, Cal. Evidence (2d ed. 1966) §§ 496-497, pp. 467-469.)

fendants herein did not request an instruction on the intent required for theft by false pretenses is of no consequence.

In *People* v. *Ashley, supra,* 42 Cal.2d 246, 264, the court held that the specific intent showing required to convict a defendant of theft by false pretenses must go beyond mere nonperformance of a promise or actual falsity of a representation. Defendants herein claim that the trial court's instruction fell short of the *Ashley* standard.

The trial judge instructed the jury that it must find that a false representation had been made *and* that this representation was made with the specific intent to defraud. (CALJIC No. 14:10.) This instruction fulfilled the requirements of *Ashley*. *Ashley* does not prescribe the *language* a trial judge must use; what the *Ashley* rule requires, in effect, is that the instruction make it clear to the jury that theft by false pretenses requires both a false representation *and* the intent to defraud; the rule insures that the trial judge clearly differentiate these two elements of the offense for the jurors.

Though the trial court's instruction was merely a reading of the definition of the crime of theft by false pretenses, the instruction clearly distinguished the two elements of the crime. It is clear from the instruction that *intent* to defraud was an essential element of the crime which had to be proved apart from proof of the falsity of the alleged pretense. The instruction was sufficient.

## THE GRAND JURY PROCEEDINGS

Sometime prior to the defendants' indictment for theft and bribery, an Orange County grand juror (Lloyd Charton)—under pressure to do so from the Orange County District Attorney's office—withdrew from consideration of criminal cases. Charton, a law student, was employed by a local criminal defense attorney and had, on occasion, used his grand jury status to gain access to the district attorney's files on behalf of his employer, and had sought to interview the lawyer's imprisoned clients. The district attorney was naturally distressed by Charton's behavior. Initially, he requested that Charton be removed. Simultaneously, he refused to bring any criminal matters before the grand jury and initiated criminal proceedings solely by way of information.[9] Finally, Charton was prevailed upon to remove himself from the grand jury panel when it considered criminal cases.

---

[9]The district attorney has discretion regarding whether to indict a defendant or bring charges by information. (Pen. Code, § 737.)

Defendants argue that the grand jury proceedings subsequent to the aforementioned activity, at which McWhinney and Fujita were indicted, were tainted by Charton's forced withdrawal, and therefore improper and invalid. With this argument, we disagree.

 First, defendants argue that the pressure the district attorney brought to bear on the grand jury to secure Charton's withdrawal constituted undue and improper influence of the panel, and thereby invalidates the indictment.

It is undisputed that the grand jury must be impartial, and drawn from a cross-section of the community. (*People* v. *Carter,* 56 Cal.2d 549, 569 [15 Cal.Rptr. 645, 364 P.2d 477].) The defendants seem to argue that the district attorney's behavior was improper because he pressured a "defense-oriented" juror off the panel; such an argument is of little moment. The seminal characteristic of a grand jury panel is its *impartiality*—ideally, all jurors should be without bias against either the state or the defendants. It appears that the district attorney was merely helping to achieve the mandate of impartiality.

Ignoring the requirement of impartiality, it is difficult to see how the activity by the district attorney can be interpreted as "pressure" on the other grand jurors which somehow forced them to submit to the prosecutor's will. Implicit in defendants' allegation of "pressure" is that the other grand jurors were fearful of being forced off the panel if they refused to bring back indictments unquestioningly. But it is not at all clear why this particular inference should be drawn. It seems just as likely, as an intuitive proposition, that the grand jurors would be angered by such "pressure," were it unjustified, and thereby become more resistant to the prosecutor's will. Absent any showing by defendants that the district attorney's activities in fact coerced the grand jurors or that they were in fact prejudiced, the argument is unpersuasive.

 Second, defendants maintain that they were denied due process and equal protection of the law when Charton withdrew from the grand jury. The requirement that a grand jury be composed of an impartial cross-section of the community has led California to adopt the following rule: Whenever a class of persons in the community has been systematically and purposefully excluded from a grand jury, persons indicted by that grand jury are deemed to have been denied due process and equal protection of the law. (*People* v. *Superior Court (Dean),* 38 Cal.App.3d 966, 970 [113 Cal.Rptr. 732].) This rule applies only when members of an identifiable community group (e.g., one identified by race,

sex, age, religious belief, educational attainment, political affiliation, economic status or geographic background) are excluded. (*Ibid.*, p. 970.)

 In order to challenge an empaneled grand jury because of imbalance, a party must demonstrate that he has the requisite standing to raise such a challenge: he must show that he is a member of the excluded class *or* otherwise establish a serious probability of bias. (*People* v. *Sirhan,* 7 Cal.3d 710, 753 [102 Cal.Rptr. 385, 497 P.2d 1121], cert. den., 410 U.S. 947 [35 L.Ed.2d 613, 93 S.Ct. 1382]; *People* v. *Superior Court (Dean), supra,* 38 Cal.App.3d 966, 972.)[10] The requisite bias may be inferred from the circumstances of the case; it need not be shown by direct evidence.[11]

Defendants are confronted by two insurmountable obstacles in attempting to challenge the Orange County Grand Jury on constitutional grounds. First, they have not shown that Charton was forced from the panel because he was a member of an *identifiable class* within the community; defendants note only that Charton was a law student and, inferentially, pro-defense. But his exclusion from the grand jury because he can be so classified is not enough to make the grand jury's composition constitutionally impermissible. Second, defendants have not demonstrated that they have the requisite standing to assert this challenge: they are neither members of the same "class" (whatever that might be) as Charton, nor have they demonstrated a "probability of bias" emanating from the exclusion of "Charton's type" from the grand jury. They have shown no circumstantial facts to indicate that Charton's exclusion in anyway *biased* their hearing before the grand jury; rather, they seem to argue that the mere fact of their indictment following Charton's forced withdrawal is sufficient circumstantial evidence for this court to draw an inference of bias; the argument is unpersuasive.

 Section 940 of the Penal Code requires that a minimum of

---

[10]The reason for the "standing" requirement has been stated thus: "Implicit in the requirement of standing is judicial recognition that an accused may not nullify the criminal proceeding against him for the sake of an abstract claim, even one founded upon the Fourteenth Amendment; rather, he must show some likelihood of injury." (*People* v. *Superior Court (Dean), supra,* 38 Cal.App.3d 966, 972-973.)

[11]Recently the U.S. Supreme Court has indicated that where grand jury exclusion has taken place *along racial lines,* an apparent presumption of prejudice or bias arises. In *Peters* v. *Kiff,* 407 U.S. 493 [33 L.Ed.2d 83, 92 S.Ct. 2163] the court accorded standing to a white man to challenge the selection of a grand jury from which blacks had been purposefully excluded, though he made no showing of probable bias. This holding is, obviously, not applicable herein.

12 grand jurors concur before an indictment can be returned.[12] And it is the rule in California that any evidence taken by the grand jury in the course of its investigation may be considered by it in determining whether or not to issue an indictment—as long as at least 12 grand jurors *who heard all the evidence* so considered concur in finding the indictment. (*People* v. *Pipes,* 179 Cal.App.2d 547, 553 [3 Cal.Rptr. 814].)

Defendants contend that an insufficient number of grand jurors (11) heard the case against them, thereby rendering the indictment invalid.

Four grand jury hearings were had at which testimony was introduced. Nineteen grand jurors heard testimony at one or more of these hearings. But only 11 grand jurors who attended the first hearing attended the second, third and fourth hearings. (It is uncontested that at least 12 grand jurors attended each of the last 3 hearings.)

At the second session, the district attorney requested that the grand jury disregard the testimony introduced at the first hearing. Then the district attorney introduced into evidence a transcript of George Murai's testimony from that first hearing. Defendants argue that the testimony contained in this transcript was improperly considered by the grand jury in returning the indictment against them since only 11 grand jurors who heard Murai's testimony at the first hearing heard all the evidence presented at the second, third and fourth sessions.

But Murai appeared before the grand jury at the second session and delivered substantially the same testimony he had the first time. Consequently, at least 12 grand jurors heard *all* the evidence.

Defendants also argue that since Murai's testimony at his first appearance differed slightly from that given at his next appearance, those grand jurors who were present at the three final sessions were not aware of *all* the evidence. But the transcript of the proceedings makes it clear that the grand jurors were aware of the inconsistencies in Murai's testimony and were able to adequately evaluate that testimony.

Even if we were to assume that Murai did not provide the grand jury

---

[12]In counties where the statutorily "required number" of grand jurors is 19. (Pen. Code, § 888.2.) At the time of the defendants' indictment, the Orange County Grand Jury was composed of 19 members.

with precisely the same evidence at the first and second sessions, or that portions of Murai's testimony delivered at the second session were improperly considered because of the alleged inconsistencies, the indictment brought against these defendants is nonetheless valid. ▮ The presentation to the grand jury of inadmissible or tainted evidence does not in itself invalidate an indictment. If sufficient competent evidence, exclusive of the challenged evidence, was presented to indict, the indictment will not be found defective. (*Callan* v. *Superior Court,* 204 Cal.App.2d 652, 662 [22 Cal.Rptr. 508]; *People* v. *Dale,* 79 Cal.App.2d 370 [179 P.2d 870], cert. den., 327 U.S. 809 [90 L.Ed. 1033, 66 S.Ct. 966]; Pen. Code, § 939.8.) Sufficient evidence was presented to 12 grand jurors to justify the indictment.

## CONCLUSION

Substantial evidence supports the convictions. The trial and grand jury proceedings were fairly conducted.

The judgments of conviction are affirmed.

Kaufman, J., and Whyte, J.,* concurred.

A petition for a rehearing was denied December 11, 1974, and appellants' petition for a hearing by the Supreme Court was denied January 23, 1975.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the *Judicial Council.*