Filed 4/9/26  P. v. Superior Court (Morris-Kerin) CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Petitioner, | E086208 |
| v. | (Super.Ct.No. SWF2307099) |
| THE SUPERIOR COURT OF RIVERSIDE COUNTY, | OPINION |
| Respondent; | |
| MICHELLE LOUISE MORRIS-KERIN, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS; petition for writ of mandate.  Timothy F. Freer, Judge.  Petition granted.

Michael A. Hestrin, District Attorney, and David J. Allen, Deputy District Attorney, for Petitioner.

No appearance for Respondent.

David R. Greifinger, under appointment by the Court of Appeal, for Real Party in Interest.

INTRODUCTION

In this writ proceeding, the People challenge the trial court's order dismissing one count of a 15-count grand jury indictment against Michelle Morris-Kerin arising from her treatment of patients at her residential care facility. The indictment charged Morris-Kerin with murder, manslaughter, child abuse, and physical and sexual abuse of dependent adults. The count at issue here, count 15, alleges that Morris-Kerin aided and abetted lewd conduct against a dependent adult—her adopted son, Ryan M. (Pen. Code, § 288, subdivision (c)(2).)[1]

After denying Morris-Kerin's motion to set aside the indictment under section 995 and concluding that each count was supported by probable cause, the trial court granted in part her motion for reconsideration and set aside the indictment as to count 15. The court concluded that by playing a video recording of Ryan's forensic interview for the grand jury, the People presented improper hearsay to support count 15. The court further concluded that the error was "unduly prejudicial" because Ryan "described the facts that constitute the offense" during the interview.

The People argue that the trial court's ruling is erroneous, and we agree. As the court concluded in its ruling on Morris-Kerin's first section 995 motion, the People presented sufficient evidence, aside from the interview, to support count 15. Moreover,

---

[1] Unlabeled statutory citations refer to the Penal Code.

2

the court's conclusion that Ryan described the facts of the offense in his interview is not supported by the record. Ryan did not describe any sexual conduct during his interview. The facts of the offense came from the testimony of witnesses during the grand jury proceedings. We therefore grant the petition.

FACTUAL AND PROCEDURAL BACKGROUND

A. *The Indictment Proceeding*

During the relevant time period, from 2012 to 2019, Morris-Kerin ran out of her home in Murrieta the "Morris Family Home," a residential care facility for individuals with severe medical conditions. As the primary caretaker, she was responsible for overseeing patient care and hiring and training staff.

In 2023, the People convened a grand jury to consider 15 criminal charges against Morris-Kerin concerning 11 patients—one count of murder (§ 187, count 1), one count of involuntary manslaughter (§ 192, subd. (b), count 2), five counts of child abuse (§ 273a, subd. (a), counts 3-7), five counts of abuse of a dependent adult (§ 368, subd. (b)(1), counts 8-12), and three counts of lewd conduct upon a dependent person (§ 288, subd. (c)(2), counts 13-15). Counts one through three relate to the death of D.R., a seventeen-year-old patient, on April 6, 2019. Counts four through seven allege child abuse against D.R. and three other minor patients. Counts eight through 12 allege abuse against five dependent adult patients. Counts 13 through 15 allege lewd conduct against three dependent adult patients, including Ryan. As relevant here, the People's theory of guilt for count 15 was that Morris-Kerin aided and abetted her brother's friend, Sean S., in committing lewd acts upon Ryan.

3

After hearing testimony from over 45 witnesses during a two-week long proceeding, the grand jury indicted Morris-Kerin on all 15 counts. Because only count 15 is at issue, we limit our summary to that charge.

Ryan was born in 1994 and has been in a limited conservatorship over his person since he was 18 years old. He has cerebral palsy, as well as speech and cognitive impairments that limit his ability to communicate verbally. When Ryan was three years old, Morris-Kerin became his foster mother. She adopted him several years later, when he was 10 years old.

Courtney Thomas, a certified nursing assistant, worked as a caregiver at the Morris Family Home, from 2008 to 2011, when Ryan was a teenager. She testified that Ryan attended middle school during that time and appeared to her to have the mental capacity of a six- or seven-year-old child. She described Morris-Kerin's treatment of Ryan as emotionally abusive and said that Morris-Kerin would often discipline Ryan by locking him in his room and telling him that his biological family did not want him anymore because he was a bad child.

Thomas testified that she witnessed Morris-Kerin encourage Ryan to touch another man inappropriately and praise Ryan when he did so. According to Thomas, Morris-Kerin asked her to drive Ryan and two male employees from Ryan's school district to the store to run an errand. Before they left, Morris-Kerin told Ryan that he could touch the men "wherever [he] want[ed]" and motioned to her genital area. Ryan smiled and said, "Really?" and Morris-Kerin replied, "Yes, it's okay." During the drive, Ryan put his hand on one of the men's legs, and as he tried to move his hand upward, the

4

man pushed him away and told him no. When the group returned from the errand and Ryan told Morris-Kerin what he had done, Morris-Kerin acted "very proud" of him and told him that he had done a "good job."

In 2011, Ryan met Sean, a friend of Morris-Kerin's brother, Greg. Sean is 17 years 11 months older than Ryan. When they met, Ryan was 17 years old and Sean was 34. At the time, Greg and Morris-Kerin were serving as Ryan's conservators. Sean and Ryan quickly became friends and started hanging out together at Morris-Kerin's home, where she ran the care facility. According to both Sean and staff at the facility, Ryan would often touch Sean inappropriately in front of others.

On Ryan's 18th birthday, Morris-Kerin approached Sean and asked him if he intended to date Ryan. She told Sean that if he was not planning to date her son, she was going to have to console Ryan and "pic[k] up the pieces." Sean agreed to begin a romantic relationship with Ryan. He testified that it was important to him that Morris-Kerin was supportive of the relationship because Ryan was a "conserved adult" and she was his conservator and thus responsible for making certain decisions for him.

One night, early on in their relationship, when Ryan and Sean were in Ryan's room, Ryan called Morris-Kerin in and asked her if it was "okay if [they] had sex." Morris-Kerin said they could have sex if they both wanted to, and she showed Ryan how to dim the bedroom lights to make "mood lighting." Sean was too embarrassed to have sex with Ryan that day. However, he testified that he did not think it was strange for Ryan to ask his mother for permission to have sex because Ryan was a conserved adult and needed her permission for many things.

5

Sean testified that, while he and Ryan were dating, they had had talks about "what he thought sex was" and that Ryan thought it consisted of lying down in bed cuddling, with clothes on. Sean said that he was concerned that Ryan was not able to say no when it came to sexual acts. He described an incident when he tried to have anal sex with Ryan but stopped part way through because, although Ryan was saying he wanted to do it, his body language indicated that he was uncomfortable. Sean said that Ryan liked to have sexual acts performed on him but did not like to reciprocate. He explained, "Ryan was very interested in me, as he would put it, playing with his penis. Ryan wasn't so interested in playing with mine." Sean testified that he rubbed Ryan's penis with his hand and performed oral sex on Ryan.

According to Sean, Morris-Kerin was "very supportive" of his romantic relationship with Ryan. She told Sean that she had not been able to hire male staff "because Ryan would touch them inappropriately," but that once Ryan started dating him, "that problem went away."

Karissa Vollan, a certified nursing assistant, worked at the Morris Family Home during the time that Sean and Ryan were dating. She testified that she found their relationship "very odd" because Sean was much older than Ryan and because Ryan appeared to her to have the mental capacity of a four-year-old child. Vollan said that Ryan "would go to Sean's house to stay the night but, in the morning, Sean would bring Ryan back to the home, and Ryan would get on the school bus to go to school." She once asked Morris-Kerin about whether Sean and Ryan's relationship was appropriate and Morris-Kerin became "very defensive" and said that they "had been dating for quite some

6

time and that it is normal." Vollan once walked in on Sean and Ryan when they were showering together, and Morris-Kerin said that they had to shower at her house because the shower at Sean's was broken. When Sean and Ryan got married, Morris-Kerin threatened to fire Vollan if she did not attend the wedding.

Sean and Ryan married in October 2014. Morris-Kerin financed the wedding. The People played a video of the wedding for the grand jury. During the ceremony, Ryan appears distracted and confused and comments that he is at a baptism. Sean testified that he believed the video had been edited by Ryan's biological family and that Ryan was joking about the baptism.

After the wedding, Ryan moved in with Sean and his parents, and Sean became Ryan's conservator. Sean said when Ryan hit his (Sean's) mother and threw tantrums, he would discipline Ryan by taking away his video games. Sean's mother also disciplined Ryan at times.

In 2016, Ryan's biological twin brother, Ronald M., petitioned to remove Sean and appoint himself and Ryan's maternal aunt as conservators.[2] In connection with that

---

[2] In an unpublished opinion, we affirmed the trial court's order removing Sean as Ryan's conservator for conflict of interest and abusive behavior. (*Conservatorship of Ryan M.* (Apr. 8, 2022, E072813) [nonpub. opn.].) The court explained the conflict of interest as follows: " 'Based upon all of the evidence, including the wedding video, it appears that Ryan does not have the mental capacity to understand what a marriage is and therefore does not have the capacity to understand consent to be and remain married. That in and of itself places him in a vulnerable position as Sean is not only his spouse, but his conservator. Ryan expressed at deposition that he no longer wanted to be married to Sean, but wanted to be friends. *Ryan retains the right under the conservatorship to make that decision, but practically speaking would have to rely upon Sean in the role as his conservator to make that happen.*' " (*Ibid.*)

litigation, the Riverside County Department of Social Services (DPSS) investigated a referral alleging that Morris-Kerin and Sean were emotionally abusing Ryan and that Morris-Kerin was neglecting him. The DPSS social worker who interviewed Morris-Kerin during that investigation testified that Morris-Kerin believed Ryan's relationship with Sean was appropriate. When asked if she believed that Ryan could consent to sexual behavior, Morris-Kerin responded that Ryan "was going to have sex anyway" and that having sex with Sean was "a better situation" because the "connection" between the two of them "was strong enough." Morris-Kerin told the social worker that Ryan had been touching other males inappropriately since the age of 12, the age he became "potty-trained."

To establish that Ryan lacked the capacity to consent to sexual behavior, the People introduced a video of an interview with Ryan that was conducted in 2021 by forensic interviewer Jacklyn Saldana to investigate allegations that Ryan was being sexually abused. The answers Ryan provided during that interview were mostly nonresponsive. For the most part, Ryan fixated on his interests (playing video games, going to Disneyland, and visiting the zoo) and his brother Ronald. When asked if anyone had "bothered" or "touched" him, he responded that Ronald "he . . . copy me." Ryan later asked Saldana, "Are you a-arrest Ronald?" At other points, Ryan said that Ronald cut him with a knife, did not like theme parks, shot him in the "balls" with a gun, tried to turn him into a girl, and wanted him to "misbehave."

Saldana asked Ryan several questions aimed at determining whether Sean was sexually abusing him. Ryan would often respond to those questions by saying that Sean

8

was his husband and that he loved his husband. Ryan said that he loved Sean because he's a "nice man" and he "buys me coffee." Ryan's responses regarding what he and Sean did together were mostly nonresponsive, but he mentioned that Sean (who drove a semitruck for a living) took him to Disneyland and to work in "his truck." When Saldana asked, "What do you do when you sleep with Sean," Ryan said that Sean "likes to cuddle me." Ryan said that cuddling meant "give me a hug," and when asked if his clothes were on or off during the cuddling, Ryan said his clothes were on. Saldana asked Ryan, "When you're with Sean, does anything happen with [your] penis?" and Ryan responded, "No."

Saldana testified regarding her attempt to interview Ryan about the allegations of sexual abuse. She said that Ryan had difficulty communicating, that he did not appear to understand the difference between truth and lies, and that she was unable to get through baseline questions. She explained that she was not able to discuss the topic of sexual abuse with Ryan because "[h]e was not able to either understand the questions or wasn't able to articulate any answers regarding those questions." She added, "I was trying to have him express [his] thoughts. But it was very difficult for him to communicate what the emotion was, what was happening, what he was thinking."

Scott Modell, the People's expert on developmental disabilities and capacity to consent to sexual behavior, interviewed Ryan to assess his capacity to consent. Prior to the interview, Modell reviewed the video of Ryan's wedding and the video of Ryan's forensic interview with Saldana. Modell testified that Ryan's communication abilities in the forensic interview were consistent with those of someone who had an intellectual

9

disability. He testified that Ryan "was not able to answer open-ended questions," had "difficulty tracking the conversation," and had a "very limited . . . sentence structure." From his review of the wedding video, Modell opined that Ryan "didn't know really why he was there." Modell testified that he was not able to conduct a full interview with Ryan because, although Ryan's "overall use of language and conversational style" was similar to what he exhibited during the forensic interview with Saldana, his level of engagement was much lower.

During closing statements, the prosecutor argued that, while serving as Ryan's conservator, Morris-Kerin willfully encouraged Sean to commit a lewd act upon Ryan, with the intent of arousing her own or Ryan's sexual desires. As proof that Morris-Kerin facilitated the lewd conduct, she discussed testimony from Thomas and Sean, as well as Morris-Kerin's own statements to the DPSS social worker. The prosecutor argued that Sean's testimony demonstrated that Ryan had the mental capacity of a young child, pointing out that "Sean would discipline Ryan by taking away his video games as punishment," which, she argued, was "[v]ery similar to a parent-child dynamic." The prosecutor argued that Ryan's forensic interview with Saldana demonstrated that he "doesn't seem to understand the difference between the truth and a lie" and that he lacked capacity to consent to sexual behavior.

On November 20, 2023, after a two-week long hearing, the grand jury returned an indictment on all 15 counts.

10

B. *Motions to Set Aside the Indictment*

Morris-Kerin moved to set aside the indictment for lack of probable cause. In August 2024, the trial court issued a written order ruling that all 15 counts were supported by probable cause. As to count 15, the trial court concluded that the charge was sufficiently supported by Thomas's and Sean's grand jury testimony and Morris-Kerin's statements to the social worker.

The court stated:[3] "Here, Sean committed a lewd and lascivious act [by] engaging in manual stimulation of Ryan's penis and by performing oral sex on him. While Morris-Kerin may not have known the particular time and manner that the sexual acts would be performed, there is probable cause to believe that she knew Sean intended to engage in sexual conduct with Ryan. Morris-Kerin knew the two were dating and encouraged it, and she knew Ryan had a history of sexually touching men. Ryan himself even asked defendant in front of Sean if they could engage in sex, and Sean himself spoke to Morris-Kerin about engaging in sexual conduct with Ryan. With all of this knowledge, Morris-Kerin told Ryan that it was okay to engage in sex, even providing some advice about mood lighting, and told Sean that sexual conduct was okay. This establishes probable cause to believe that before the commission of the lewd touching, defendant intended to aid and abet, in the form of encouragement, Sean in committing the offense. Finally, Morris-Kerin's words did in fact aid and abet Sean's commission of the lewd acts. Sean testified that he was hesitant about engaging in sexual conduct with Ryan due to Ryan's

---

[3] For ease of reading, we have substituted our naming conventions for the court's.

11

cognitive limitations and that the encouragement from Morris-Kerin helped him feel that it was okay to do so. Morris-Kerin aided and abetted the act with the intent of gratifying the lust, passions, or sexual desires of Ryan. This is supported by her statements that Ryan was going to have sex anyway and that he had stopped touching other men inappropriately, suggesting that since Ryan was able to gratify his sexual desires with Sean, he did not try to engage with others."

After this court denied her writ petition challenging that ruling, Morris-Kerin filed a motion asking the trial court to reconsider her section 995 motion. Regarding count 15, she argued that Ryan's forensic interview was improper hearsay. The People opposed the motion. As relevant here, they argued that the interview was not hearsay because it was not admitted for the truth of Ryan's statements but rather to demonstrate that he lacked the capacity to consent to sexual behavior. The People pointed out that Saldana testified to the grand jury that she was unable to discuss the allegations of sexual abuse with Ryan and that "[a]t no time during the interview did Ryan describe sexual acts occurring with [Sean], nor did he articulate [Morris-Kerin's] role in their relationship."

At the conclusion of the hearing on Morris-Kerin's motion to reconsider, the trial court took the matter under submission and informed the parties that it would issue a written ruling within 30 days. Shortly after the hearing, the People filed supplemental briefing, adding the point that their capacity expert, Modell, had reviewed the forensic video in preparation for his testimony. In response to the People's request to lodge the video of the forensic interview (People's Exhibit 32) with the trial court, the courtroom assistant responded that the court "has indicated that it's not necessary."

12

In April 2025, the trial court issued a written order granting the motion to set aside the indictment as to count 15 and denying the motion as to the remaining claims. As to count 15, the court concluded that the introduction of the forensic interview violated Morris-Kerin's due process rights. The court stated: "While there may arguably have been a valid reason to introduce some of [Ryan's forensic interview] for a non-hearsay purpose, it was unduly prejudicial to introduce the entire interview and allow the jury to hear the full substance of the statements, which essentially described the facts that constitute the offense, and especially without giving any limiting instruction."

The People filed a petition for a writ of mandate challenging the trial court's order and requesting a stay. We granted the stay request and issued an order to show cause.[4]

DISCUSSION

The People argue that the trial court abused its discretion by concluding that Ryan's forensic interview was unduly prejudicial hearsay. They contend that the basis for the court's conclusion—its finding that Ryan "describe[d] the facts that constitute the offense" during the interview—is not supported by the record. We agree.

The role of the grand jury in an indictment proceeding is to "determine whether probable cause exists to accuse a defendant of a particular crime." (*Cummiskey v. Superior Court* (1992) 3 Cal.4th 1018, 1026.) Probable cause " ' "means such a state of

---

[4] Writ review is appropriate under these circumstances because it will "obviate[e] the need for multiple trials involving the same facts." (*People v. Superior Court (Farley)* (2024) 100 Cal.App.5th 315, 325 [concluding that an appeal was an inadequate remedy because proceeding by appeal "would accomplish nothing but further delay and requiring a second trial on the same facts"]; see *People v. Superior Court (Martinez)* (1993) 19 Cal.App.4th 738, 743 [same].)

facts as would lead a man of ordinary caution or prudence to believe, and conscientiously entertain a *strong suspicion* of[,] the guilt of the accused." ' " (*Id.* at p. 1029.) "The grand jury serves as the functional equivalent of a magistrate who presides over a preliminary examination on a felony complaint." (*Stark v. Superior Court* (2011) 52 Cal.4th 368, 406 (*Stark*).) "Like the magistrate, the grand jury must determine whether sufficient evidence has been presented to support holding a defendant to answer on a criminal complaint." (*Cummiskey*, at p. 1027.)

The court's role in reviewing a grand jury indictment is "limited." (*Stark*, *supra*, 52 Cal.4th at p. 406.) " 'The duty of determining whether or not an indictment should be found is lodged exclusively in the grand jury and not in the courts.' [Citation.] The reviewing court does not substitute its judgment as to the weight of the evidence for that of the grand jury, and must draw all reasonable inferences in favor of the indictment." (*Id.* at pp. 406-407.)

As relevant here, a grand jury is generally prohibited from receiving hearsay evidence other than from a sworn law enforcement officer for the purpose of laying foundation. (Pen. Code, § 939.6, subds. (b), (c).) The "[e]vidence received by a grand jury must be admissible at trial." (*Mason v. Superior Court* (2015) 242 Cal.App.4th 773, 786 (*Mason*).) However, "[t]he presentation to the grand jury of inadmissible or tainted evidence does not in itself invalidate an indictment." (*People v. Fujita* (1974) 43 Cal.App.3d 454, 478.) "If sufficient competent evidence, exclusive of the challenged evidence, was presented to indict, the indictment will not be found defective." (*Ibid.*) In this context, sufficient competent evidence means "sufficient evidence to establish

probable cause." (*Mason*, at p. 787.)  To establish a due process violation from the introduction of inadmissible evidence or the failure to give a limiting instruction, the error must have "compromised the independence of the grand jury" or "contribute[d] to the decision to indict."  (*People v. Saam* (1980) 106 Cal.App.3d 789, 799.)

In *People v. Backus* (1979) 23 Cal.3d 360, our Supreme Court concluded that a transcript of a prior preliminary hearing "was not evidence admissible at trial and thus should not have been given to the grand jury."  (*Id.* at p. 394.)  However, the court further held that the grand jury's consideration of the inadmissible evidence was harmless and thus did not contribute to its decision to indict.  The court explained:  "[O]ur review of the transcript suggests that rather than being prejudicial to defendants, if fully read by the grand jury, it could have been helpful."  (*Ibid.*)

Applying these principles here, we conclude that the trial court erred by concluding that the presentation of Ryan's forensic interview to the grand jury required the setting aside of count 15.  Even if the trial court was correct that Ryan's forensic interview was improper hearsay, the court failed to consider whether the People presented sufficient other evidence to support count 15, as the standard requires.[5]  On this record, the trial court's ruling on Morris-Kerin's first section 995 motion compels the

---

[5]  The People argue that Ryan's forensic interview was not hearsay because it was not offered for the truth of the matter but rather as evidence that Ryan lacked the capacity to consent to sexual behavior.  They argue in the alternative that if the interview was hearsay, they were nevertheless required to present it to the grand jury as exculpatory evidence under *Johnson v. Superior Court of San Joaquin County* (1975) 15 Cal.3d 248.  We need not decide whether the interview was hearsay because, even if it was, its presentation to the grand jury is not a ground for setting aside the indictment.

15

conclusion that count 15 is supported by sufficient evidence, exclusive of the forensic interview. In that ruling, the court concluded that Sean's testimony, Thomas's testimony, and Morris-Kerin's statements to the DPSS social worker supplied the necessary probable cause to support the grand jury's indictment on count 15. As the court noted, Sean testified that Morris-Kerin encouraged a sexual relationship between Sean and Ryan and that he (Sean) and Ryan engaged in sexual behavior. Morris-Kerin told DPSS, Sean, and her staff that she supported the relationship. She told the DPSS social worker that it was a better situation for Ryan to engage in sexual behavior with Sean than with a stranger. Significantly, the court did not even mention Ryan's forensic interview in its discussion of the evidence supporting the charge.

Moreover, like in *Backus*, Ryan's forensic interview was not prejudicial to Morris-Kerin. (*Backus*, *supra*, 23 Cal.3d at p. 394.) We have reviewed the transcript of the forensic interview, and Ryan does not provide any statements that could be perceived as describing sexual conduct, let alone the facts of count 15.[6] As Saldana testified, she was unable to discuss the topic of sexual abuse with Ryan. Most of his answers were nonresponsive and difficult to understand. If anything, the forensic interview was helpful

---

[6] At oral argument, Morris-Kerin's counsel pointed to the comments (summarized above) that Ryan made about Ronald during his interview. He argued that, because we do not know who Ronald is, those comments were the most prejudicial aspect of the interview. Specifically, counsel contended that if Ryan's references to "Ronald" were somehow references to Sean or to someone else who worked at Morris-Kerin's facility, then the statements could serve as inculpatory evidence about the abusive practices at the facility. The argument fails because we do know who Ronald is. As noted above, he is Ryan's biological twin brother, and, other than his successful petition to remove Sean as Ryan's conservator, he has nothing to do with Morris-Kerin or her facility.

16

to Morris-Kerin because Ryan denied that Sean ever touched his penis and described the extent of their physical engagement as hugging with clothes on. The evidence that Morris-Kerin encouraged Sean to engage in sexual behavior with Ryan came entirely from Morris-Kerin herself, Sean, or staff.

Moreover, the prosecutor made clear during her closing argument that the interview's sole purpose was to demonstrate Ryan's lack of capacity to consent to sexual acts. We therefore reject Morris-Kerin's contention that we should uphold the trial court's ruling because the evidence of guilt was conflicting at the forensic interview "tipped the scales" toward guilt.

Because the People presented sufficient evidence to support count 15 and because introduction of the forensic interview was not prejudicial, we conclude that the trial court erred in granting the motion to set aside the indictment with regard to count 15.

DISPOSITION

Let a peremptory writ of mandate issue directing the superior court to (1) vacate its order of April 23, 2025, granting Morris-Kerin's motion to reconsider in part and dismissing count 15, and (2) enter a new order denying Morris-Kerin's motion. The stay issued by this court on July 28, 2025, is vacated upon issuance of the remittitur.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS _____
J.

We concur:

RAMIREZ _____
P. J.

CODRINGTON _____
J.