Filed 9/2/16  P. v. Delgado CA1/1
Received for posting 9/7/16

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>NELSON CARLOS DELGADO,<br><br>        Defendant and Appellant. | A141714<br><br>(San Francisco City & County<br>Super. Ct. No. 218411) |

Defendant Nelson Carlos Delgado appeals from his conviction of oral copulation of an eight-year-old girl and related crimes.  He asserts the trial court wrongly excluded evidence regarding the lone eyewitness's mental health and sexual history.  However, given that the trial court allowed significant testimony on these topics, and given the limited nature and low probative value of the excluded evidence, the court's evidentiary rulings were neither an abuse of discretion nor a violation of defendant's constitutional rights.  And even assuming the trial court erred, the error was harmless.  We therefore affirm.

### BACKGROUND

*Events at Victoria Park*

In May 2012, an eight-year-old girl with Down's Syndrome, Jane Doe, went to Victoria Park in San Francisco with her mother and siblings.  At some point, Doe went off to use the bathroom and Doe's mother lost sight of her for a few minutes.

Maria K. and her then-boyfriend Joseph A. were also at Victoria Park.  They were homeless at the time and park regulars.  Maria, like Doe, went to use the park's

1

bathroom. She entered the men's bathroom because the women's one was occupied. Once inside, Maria saw defendant in a stall facing the toilet. She also saw a little girl, facing defendant, with her back toward the toilet. Defendant was holding the young girl by the head or hair and his penis was in her mouth. The little girl was gagging. Maria was later able to identify the girl as Doe.

Maria left the bathroom, called Joseph for help, and told him what she had seen. Then, as Joseph tells it, Joseph confronted defendant and asked what he was doing. Defendant said he was cleaning the bathrooms. Joseph then saw a little girl running away. Defendant fled the park as a posse Joseph had roused attacked and pursued him.

A man ran up to Doe's mother and told her about the molestation. The mother found Doe in the playground. She asked Doe if she had been touched. Doe did not answer, but her eyes filled up with tears. Doe seemed scared, and her mother observed an unusual red rash around Doe's lips.

The next day, Joseph and Maria were again at the park and saw defendant. Joseph summoned police, who came and arrested defendant.

Doe later spoke with forensic interviewer Gloria Samayoa. Doe did not answer most of the questions. At trial, Samayoa offered no opinion about whether Doe's responses were consistent or inconsistent with being a molest victim.

An information charged defendant with oral copulation of a child 10 years old or younger by an adult (Pen. Code, § 288.7, subd. (b); count 1),[1] aggravated sexual assault of a person under 14 by one more than seven years older (§ 269, subd. (a)(4); count 2), forcible lewd act upon a child under 14 (§ 288, subd. (b)(1); count 3), possession of a controlled substance (Health & Saf. Code, § 11377, subd. (a); count 4), and possession of drug paraphernalia (former Health & Saf. Code, § 11364.1, subd. (a); count 5). Defendant pleaded guilty to count 5. The other counts proceeded to a jury trial.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

*Impeachment of Maria K.*

Maria was the only eyewitness to the molestation. Maria, however, had mental health troubles and had been sexually abused herself as a child. Her believability became a central issue before and during trial.

Defendant subpoenaed Maria's mental health records. A report from July 19, 2011, states Maria suffered from depression, anger, and mood swings. It relates Maria's assertion that she " 'hear[d] voices and s[aw] a black shadow following me' " and that she did not " 'want to go around people.' " It says Maria had reported some auditory and visual hallucinations for years, or "since she was little," but was not then able to afford treatment. The report concluded Maria was suffering from schizophrenia, schizoaffective disorder and bipolar affective disorder.

A report from August 2, 2011, states Maria felt her new medicine was working and that the auditory hallucinations had abated and the shadows had disappeared. According to the report, Maria said she was feeling calmer and was able to sleep. The report says Maria was then not feeling depressed, angry or anxious and that her thinking was clear with no delusions, distortions or paranoia.

A report dated September 22, 2011, describes a brief relapse when Maria stopped taking her medication for three days. Off the medication, her acute symptoms started again but they abated upon resuming her medication. According to the report, she was then thinking clearly with no distortions, delusions or paranoia. She was not depressed or euphoric, and was appropriate to situation, content, calm, pleasant, and cooperative.

Finally, a March 13, 2012 report relates another relapse coinciding with Maria stopping one of her medications. Her thinking was characterized as "paranoid, delusional, hallucinating." She was instructed to restart the medication she had stopped.

In addition to these mental health reports, defendant obtained documents showing Maria was arrested for prostitution and suffered a conviction in 1992 for lewd conduct.

Defendant retained forensic psychologist Dr. Larry Wornian to review all these records.

3

Before trial began, on June 25, 2013, the prosecution filed a motion in limine to exclude evidence regarding Maria's mental health and sexual history as irrelevant and harassing. In particular, the prosecution sought to exclude: (1) Dr. Wornian's likely testimony concerning Maria's proclivities based on her mental health records or criminal history, (2) any evidence of mental health troubles or criminality not within the weeks or months surrounding Maria witnessing the crime, (3) Maria's involuntary confinement in a psychiatric institution in October 2012 after she broke up with her then-boyfriend upon discovering he was transgender, (4) any expert testimony regarding Maria's credibility generally and (5) Maria's prior misdemeanors and arrests.

Ruling on the motion, the trial court limited testimony about Maria's mental health to allow only information regarding her ability to perceive, recollect, and explain what she saw. The court refused to allow evidence of hallucinations dating from more than six months before or after the alleged crime, specifically before September 2011 or after October 12, 2012.

Giving more specific guidance, the trial court excluded evidence of Maria's psychiatric hospitalization related to her breakup with her transgender boyfriend. It further precluded inquiry into the sexual orientation or gender of Maria or the former boyfriend. Further, the trial court excluded evidence concerning Maria's 1992 arrest for prostitution and conviction for lewd conduct, as well as all other prior misdemeanors and arrests. It also excluded evidence that Maria previously worked as a stripper.

The trial court held an Evidence Code section 402 hearing concerning Dr. Wornian's testimony. At the hearing, Dr. Wornian said that the "things that [Maria] sees . . . are inherently colored by her history." He believes "her perception of what's going on right now . . . draws inherently on her memories of what had happened to her in the past." Dr. Wornian questioned Maria's credibility given her medical records, her being molested and raped as a child, her past sexual related arrest and convictions, her past job as a stripper, her hallucinations and her psychiatric hospitalization related to her breakup with her transgender boyfriend. He believed that her sexual background, combined with her mental health issues, "have served to shape her understanding of the

4

world so that she sees things perhaps in an overly sexualized fashion." He asserted having "significant concerns . . . in terms of her reliability as a historian, whether she is given inherently to misconstruing what is going on in the world around her, how good a reader of what happens in her world, what happens in herself . . . ."

At the Evidence Code section 402 hearing, as the parties and the trial court discussed the impact of Dr. Wornian's testimony, defense counsel argued Maria had been prone to visual hallucinations, stating in September 2010, Maria reported "men were following her, men in black, shadows were following her and things of that nature." However, counsel appeared to be referring to the July 2011 report already discussed, as there is no 2010 report in the record. The court believed such evidence was irrelevant and said the documented hallucinations "relate to her. There's not one record that I've been pointed to where she has reported something occurring to other people. It's all about her. And in this particular case, it's nothing about her."

As the Evidence Code section 402 hearing ended, the trial court maintained its prior limitations, but decided to allow evidence showing Maria had been the victim of child molestation herself, saying that "our past experiences always color how we perceive things, I think the fact that Ms. Maria was a victim of child molestation is relevant, but I think the arrest, the police report, the—all that stuff is not relevant."

Largely within the parameters set by the trial court, Maria was questioned about her mental health and Dr. Wornian offered testimony on her ability to perceive.

Maria explained her mental health issues started in 2007 with depression, after she got laid off from her job as a nanny. As she conceded on cross-examination, Maria then began hearing voices, more precisely somebody calling her name. When asked if she had ever heard a voice telling her that she was seeing a child molest, a rape or any sort of sexual things, she answered no.

Maria testified she tried different medications to control her mental problems. She also testified that on May 12 and 13, 2012—the days surrounding the assault on Doe— she was on medication and it was then effective at preventing hallucinations.

5

Although Maria testified she has heard voices, on cross-examination she denied "suffer[ing] from seeing things that aren't there." Responding to defense counsel's follow up questions, she answered she did not remember whether she had ever told doctors that she had seen shadows following her or men in black following her. Maria also denied hearing voices telling her to kill herself or that she stopped taking medication because she was getting too many bad messages from her television.

Dr. Wornian testified about the nature of Maria's mental health conditions, the symptoms she suffered, and the medicine she used. Dr. Wornian based his testimony on Maria's medical reports he was able to review. Because of the limitations imposed by the court, Dr. Wornian could only talk about reports dating from September 2011 to October 12, 2012. Therefore, he did not talk about the July or August 2011 reports. He said, on direct examination, that the September 22, 2011 report indicated "the symptoms that [Maria] had originally presented with were getting worse." Wornian later admitted this report states Maria was then, when medicated, thinking clearly, with no distortions, no delusions, no paranoia, not feeling depressed, appropriate to situation, content, calm, pleasant and cooperative.

Dr. Wornian explained to the jury and the court that some symptoms related to schizophrenia may be auditory and visual hallucinations or delusions. He then talked about Maria's March 13, 2012, psychiatric report. The report indicated she was having paranoid and delusional thoughts and hallucinations. Dr. Wornian thought both auditory or visual hallucinations were possible, even though the report did not specify which sort Maria was having.

Next, Dr. Wornian referenced other mental health records from a different care provider. He described a December 2011 report showing Maria being generally maintained by her medications but still experiencing some auditory hallucinations and paranoid thoughts. He also described an August 2012 report showing Maria again stopped taking medications and experienced auditory hallucinations.

Dr. Wornian admitted Maria appears to be motivated to seek treatment. He agreed with the prosecution's assertion that "from the records, you see that when [Maria]'s

6

having troubles she goes to the doctor" and that "there are no records of her going to the doctor in April, May or June" 2012. Dr. Wornian said "she seemed to have been doing reasonably well during that period of time."

Dr. Wornian also testified Maria was sexually abused several times as a child by different family members and opined this might affect her perceptions. He explained how victims of such sexual abuses do not "see[] the world the same way"; they see through glasses that distort the world into an "inappropriately sexualized" and "threatening place." These victims can see "things that aren't quite there." Dr. Wornian said that "the accuracy of her being able to see what's in front of her eyes, . . . when you start adding the issues around the delusions, the hallucinations, . . . you begin to realize . . . and particularly in terms of sexual issues . . . she may believe what she's actually seeing but in terms of what you and I would see, it's like, huh, how did you come up with that? I just don't see it." Dr. Wornian was concerned evidence Maria had possibly witnessed other sexual activity at the park—sex occurring in bathrooms, a threat of rape, and concern (after the incident with Doe) for the possibility that another man might be molesting children—reflected a sexual preoccupation. However, when questioned by the prosecution, Dr. Wornian admitted there were no medical records showing her claiming sexual trauma or abuse or over-sexualizing her interactions.

A jury found defendant guilty of counts 1–4. He was sentenced to 15 years to life and timely appealed.

## DISCUSSION

Defendant contends the trial court prejudicially abused its discretion and violated his constitutional rights by excluding evidence he sought to introduce to impeach Maria. According to defendant, "admission of *all* evidence pertaining to her mental and sex-related legal problems was critical to ensure a fair trial." The limited evidence presented on these subjects, asserts defendant, was insufficient. The particular items defendant maintains the trial court wrongfully excluded are: Maria's 1992 arrest for prostitution and conviction for lewd conduct, her psychiatric detention after she broke up with her

7

boyfriend upon discovering he was transgender, and her possible visual hallucination in 2010/2011 when men in black were supposedly following her.

There is no question that Maria's capacity and credibility were extremely important since she was the only eyewitness to the crime. " ' "The capacity of a witness to observe, recollect and narrate an occurrence is a proper subject of inquiry on cross-examination. If as a result of a mental condition such capacity has been substantially diminished, evidence of that condition before, at and after the occurrence . . . is ordinarily admissible for use by the trier in passing on the credibility of the witness." [Citations.]' [Citation.]" (*Farrell L. v. Superior Court* (1988) 203 Cal.App.3d 521, 527–528.)

Indeed, the right to challenge a witness's capacity to perceive is secured by the Sixth Amendment. " ' "[T]he right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." ' " (*People v. Wilson* (2008) 44 Cal.4th 758, 793.) Yet, the confrontation right is not absolute. (*Id.* at pp. 793–794.) " 'Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance.' " (*People v. Chatman* (2006) 38 Cal.4th 344, 372.)

Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." This section is generally compatible with the confrontation right. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 807–808.) Thus, the exclusion of evidence under Evidence Code section 352, in a way that does not produce a significantly different impression of witnesses credibility, is also proper under the Sixth Amendment. (*People v. Chatman*, *supra*, 38 Cal.4th at p. 372; *People v. Brown* (2003) 31 Cal.4th 518, 545–546; *People v. Bradley* (2012) 208 Cal.App.4th 64, 88.)

We review a trial court's evidentiary ruling under Evidence Code section 352 for abuse of discretion (*People v. Holloway* (2004) 33 Cal.4th 96, 134), reversing only if the

court's ruling was " ' "arbitrary, capricious or patently absurd" ' " (*People v. Suff* (2014) 58 Cal.4th 1013, 1066).  If we determine the court properly exercised its discretion, there is, in turn, generally no constitutional violation.  (*People v. Espinoza* (2002) 95 Cal.App.4th 1287, 1312.)

***1992 Arrest and Conviction***

The trial court did not abuse its discretion in excluding the evidence of Maria's 1992 arrest for prostitution and conviction for lewd conduct.  These events—occurring some 20 years before Maria witnessed the incident involving Doe—are too remote in time and of virtually no relevance to Maria's veracity and accuracy of her perceptions on the day of the crime.

It is well established that " '[r]emoteness' or 'staleness' of prior conduct is an appropriate factor to consider in a[n Evidence Code] section 352 analysis." (*People v. Harris* (1998) 60 Cal.App.4th 727, 739.)  While "[t]here is no consensus among courts as to how remote a conviction must be before it is too remote . . . a conviction that is 20 years old . . . certainly meets any reasonable threshold test of remoteness." (*People v. Burns* (1987) 189 Cal.App.3d 734, 738.)  Further, Maria's 1992 arrest for prostitution and conviction for lewd conduct did not relate to her honesty or veracity.  (See *People v. Edwards* (2013) 57 Cal.4th 658, 722 [" 'When determining whether to admit a prior conviction for impeachment purposes, the court should consider, among other factors, whether it reflects on the witness's honesty or veracity [and] whether it is near or remote in time . . . .' "].)  Indeed, in *People v. Phillips* (1985) 41 Cal.3d 29, 49–51, "the Supreme Court affirmed the exclusion of evidence regarding a witness's involvement in prostitution, noting that such evidence was degrading and had an obvious potential for embarrassing or unfairly discrediting the witness." (*People v. Hayes* (1992) 3 Cal.App.4th 1238, 1248.)

To the extent defendant contends Maria's sex-related conduct 20 years ago is evidence she was likely to view Doe and defendant's "interaction" through a "sexual" lens, it was only marginally relevant at best.  Moreover, defendant was able to present far more current evidence in support of that theory from Dr. Wornian and other witnesses.

Thus, the trial court's decision to limit the number of incidents that might show Maria's possible hyper-sexualization of events was well within its discretion.

In any case, because numerous other, more salient data points as to Maria's possible perception issues were provided to the jury, the jury's impression of Maria was not compromised and any error in excluding the 1992 conduct was harmless. (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1065 [no reversal unless "it is not reasonably probable the result at trial would have been different"], citing *People v. Watson* (1956) 46 Cal.2d 818, 836.)

### *2012 Hospitalization*

On October 19, 2012, about five months after the incident involving Doe, an involuntary psychiatric hold was placed on Maria. The hospitalization occurred after she broke up with her boyfriend upon discovering he was transgender. Appellant believes Maria should have known the boyfriend was a transsexual because they had been in a long-term relationship. Dr. Wornian testified at the Evidence Code section 402 hearing that this lapse indicated she is "not a reliable reader of interpersonal cues."

But Maria's asserted difficulty in perceiving Joseph's gender is, again, of only marginal relevance to whether she accurately observed a child molestation involving oral copulation. Furthermore, evidence concerning a witness's own sexual preferences and orientation is not admissible to impeach credibility, except if used to prove bias, interest or motive of a witness. (*People v. Rowland* (1968) 262 Cal.App.2d 790, 796; *People v. Peters* (1972) 23 Cal.App.3d 522, 533.) Thus, having a mini-trial on the question of the boyfriend's gender and Maria's perception of it could have reasonably been viewed as an undue waste of time under Evidence Code section 352. Again, there was no abuse of discretion in excluding this evidence, and even if there were, it was harmless given all the other evidence presented to impeach Maria.

### *Supposed Visual Hallucination in 2010*

Turning to Maria's supposed 2010 visual hallucination, we first observe the existence of such a hallucination is suspect at best. The medical records before us and referenced in the trial court disclose no 2010 incident, and no one testified to such an

incident.  The only hint of such a hallucination appears in defense counsel's remarks at the Evidence Code section 402 hearing while arguing there were serious questions about Maria's ability to perceive reality.  Defense counsel stated:  "[S]he in September of 2010 said that men were following her, men in black, shadows were following her and things of that nature.  She was having visual hallucinations."  Looking at the psychiatric reports in the appellate record, however, they only mention an incident the next year, in July 2011, during which Maria said she was " 'hear[ing] voices and see[ing] a black shadow following [her].' "  And even though the July 2011 shadow incident was outside the one-year window the trial court imposed, Maria was asked at trial whether she had reported to her doctors seeing shadows and men in black, and she responded she could not remember.  Thus, it appears defendant may have had an opportunity to inquire about the very hallucination he claims he was precluded from presenting.

In any event, the trial court's one-year limit on mental health incidents, as applied to the facts of this case, was not an abuse of discretion.  The crucial question was Maria's ability to perceive reality in May 2012.  That Maria may have suffered a paranoid delusion in 2010 has some relevance to this crucial question, but it is of only limited value.  Moreover, it would have been cumulative evidence in light of all the evidence presented that Maria suffered delusions within the one-year time frame—in December 2011, March 2012, and August 2012, both before and after she witnessed Doe's molestation.  Thus, the pattern was well established: Maria, following her own molestation as a child, had a history of "delusions" on occasions when she stopped taking medication, but was otherwise well managed on her medications.  Adding one more supposed delusional incident in 2010 would not have changed the picture for the jury in any meaningful way.  The incident was purely "cumulative" and did not open any "new avenues for impeachment." (*Gonzalez v. Wong* (9th Cir. 2011) 667 F.3d 965, 984; see also *People v. Gurule* (2002) 28 Cal.4th 557, 595 [not every shred of witness's psychiatric history must come in].)

Finally, Maria's supposed perception of shadows or belief that men in black were following her reflect a generic paranoia, not a person who invents whole cloth stories

about others, let alone stories about criminal activity.  "It is a fact of modern life that many people experience emotional problems, undergo therapy, and take medications for their conditions."  (*People v. Anderson* (2001) 25 Cal.4th 543, 579.)  However*,* " '[a] person's credibility is not in question merely because he or she is receiving treatment for a mental health problem.' "  (*Ibid*., quoting *People v. Pack* (1988) 201 Cal.App.3d 679, 686.)

We therefore find no abuse of discretion and further conclude any error in excluding the supposed 2010 hallucination was harmless.

### Due Process Claims

While defendant alludes, in passing in his opening brief, to his Fifth and Fourteenth Amendment rights to due process and a fair trial, he does not provide any constitutional analysis.  He therefore has forfeited any such issues.  (*People v. Redd* (2010) 48 Cal.4th 691, 730.)  In any case, having concluded the trial court acted well within its discretion under Evidence Code section 352, we discern no constitutional issues here.  (See *People v. Espinoza, supra,* 95 Cal.App.4th at p. 1312.)

**DISPOSITION**

The judgment is affirmed.

_____

Banke, J.


We concur:


_____

Margulies, Acting P. J.


_____

Dondero, J.


A141714, *People v. Delgado*